268 So.2d 868

**Melvin McGUFF, alias Bo Cannon**

v.

**STATE.**

**6 Div. 208.**

Court of Criminal Appeals of Alabama.

June 13, 1972.

Rehearing Denied Sept. 12, 1972.

William J. Baxley, Atty. Gen., and J. Victor Price, Jr., Asst. Atty. Gen., for the State.

Fite, Davis & Fite, Hamilton, Nolen & Enslen, Fayette, Richard O. Fant, Jr., Tuscaloosa, for appellant.

CATES, Judge.

First degree murder with a life sentence.

According to the tendencies of the State's evidence, McGuff without provocation shot a pedestrian on a country road one Sunday afternoon in April, 1969. His defense, alibi, seems not to have impressed the jury.

## I

The first point raised arose as follows:

"Jury was selected and seated in the jury box and the rule was invoked.

"MR. DAVIS: Let the record show that over the objection of the Defendant the mother of Thomas Lee Berry, the deceased party in this case, is to sit at the counsel table with the prosecuting attorney. Even though she is not a witness and did not sign the warrent [sic] we feel [felt?] we must object on grounds it would be prejudicial to the defendant.

"THE COURT: The Court investigated that and the attorneys stated that she was not going to be used as a witness and the Court overruled and the defendant duly excepts to the same.

"Alright, state your case to the jury.

"CASE WAS THEN STATED TO THE JURY

"THE COURT: Who do you have first?

"MR. ARNIE HOWELL, having first been duly sworn testified as follows on

### "DIRECT EXAMINATION

Q (Mr. Downing) State your name please?

Q Mr. Howell, what is your training or profession?

A Arnie Howell.

A Funeral director and embalmer.

Q Were you so engaged as a funeral director on the 28th. day of April last year?

A Yes, sir.

Q Did you have an occasion on that date to see Thomas Lee Berry?

A Yes, sir.

Q Where did you see him?

A I picked him up out of an automobile at Fayette Hospital.

Q What did you do?

A I carried him to the Funeral Home and embalmed him.

Q You say this was on the 27th. day of April of last year?

A Yes, sir.

Q That is the only time you saw the deceased?

A Yes, that's right.

"MR. DOWNING: That's all.

### "CROSS EXAMINATION

Q (Mr. Davis) Mr. Howell does your record reflect what time you picked him up?

A I don't know the exact time, but I believe it was sometime in the afternoon.

Q You do not have a record of the time with you?

A I do not have it with me, I possibly have it at the Funeral Home.

"MR. DAVIS: That's all.

"THE COURT: Are you finished with Mr. Howell?

"MR. DAVIS: Yes.

"THE COURT: You may be excused then.

"AT THIS POINT IN THE TRIAL THE JUDGE CALLED ALL THE ATTORNEYS TO THE BENCH AND ADVISED THEM AS FOLLOWS:

"THE COURT: I am going to change my ruling and let the deceased boy's mother leave the Courtroom for fear that she might start crying at a later time and this might work a prejudice against the Defendant. At this time there had been no outward appearance on the part of the deceased mother and this is being done for the precaution that something might happen at a later time.

"(The mother of Thomas Lee Berry was then escorted from the Courtroom)"

Defense counsel made no effort to gainsay the court's statement that the deceased's mother had not given vent to any demonstration or other sign of emotion. In this posture we see no error.

II

The defendant elected to testify. On his cross-examination the following appears:

"Q Did you proposition a colored woman there there [sic] at the beer joint?

"MR. NOLEN: We object and move for a mistrial on ground it is prejudice.

"MR. DOWNING: We can prove that statement.

"MR. NOLEN: We move for a mistrial on grounds of what the District Attorney has said.

"THE COURT: Do not consider that, that is prejudicial and should not be in this case. Can you and each of you arridicate [sic] that from your mind and forget about that, will it effect your decision, can you forget about that and render a fair and impartial verdict? All that can do that, hold your hand up. All that can forget and hear the rest of the case and not be prejudice, [sic] hold up your hand. (all hands of jurors were held up)

"THE COURT: Let the record show the Court polled the jury and they can irridicate [sic] that from their minds and that the motion for a mistrial is denied.

"MR. NOLEN: We except."

■ In homicide cases the doings of the accused for the entire day beforehand are generally relevant against him usually to show preparation, etc. However, threats or hostile demonstrations by the accused toward persons not connected with the deceased are not admissible. Johnson v. State, 265 Ala. 360, 91 So.2d 476; Wiggs v. State, 24 Ala.App. 22, 129 So. 706.

■ Here no answer to the question came into evidence. The trial judge charged out any anticipatory implications from the question. The polling of the jury capped the incident. We find no error in denying the motion for a mistrial. Freeman v. State, 45 Ala.App. 271, 229 So.2d 46.

III

The third part of appellant's argument is devoted to various points arising from the State's rebutting testimony. This proof tended to refute the defendant's testimony to establish alibi.

Code 1940, T. 7, § 252, provides as follows:

" * * * The court may, at its discretion, at any time before the conclusion of the argument, when it appears to be necessary to the due administration of justice, allow a party to supply an omission in the testimony of such terms and under such limitations as the court may prescribe."

■ Rebuttal proof as to alibi rests basically on the principle that the State has been taken by surprise. This unfortunately arises from the want of a statute requiring

—as found in some other jurisdictions—that the defense give advance notice of alibi.

Without such a statute the State cannot anticipatorily contradict testimony which has not yet been offered. See Argo v. State, 42 Ala.App. 454, 168 So.2d 19.

Part of the State's proof related to events which took place in northernmost Tuscaloosa County. The fatal shooting occurred near Berry in lower Fayette County.

■ Sandra Carthage was one of the rebuttal witnesses. Defense counsel asked for a standing objection because "it is supposed to have happened in Tuscaloosa County away from what happened in Berry." This ground is not adequate because the appellate by offering an alibi left the door open for proof putting him at any place or places other than or different from that described by him.

Mrs. Carthage testified without objection that McGuff somewhere between Berry and some point in Tuscaloosa County harassed the party of which she and her husband were members. At one point McGuff was seen carrying a gun. Again without objection she testified that appellant fired three shots. What was McGuff's would-be target, if any, was not shown by this witness.

We find no error posed by this part of the defendant's argument.

### IV

The final claim of error is based on the overruling of the defendant's motion for new trial. We have carefully considered same and conclude that the motion was properly overruled.

### V

On cross-examination of the State's witness, Willie James Haley, it was brought out that a few days after the deceased was shot, the District Attorney, his deputy and two peace officers brought McGuff to Haley's house for identification.

The record shows the following:

"Q And ask you to identify him?

A Yes, sir.

Q Where was he?

A Right in front of my house.

Q Was it in daylight?

A Yes, sir.

Q Did you go look at him?

A Yes, sir.

Q Did you tell them they had the wrong man?

A No, sir, I didn't tell them that I told them I couldn't identify him.

Q Look at him close, could you say he was the man that did the shooting?

A I couldn't say.

Q Did you say or tell them you have got the wrong man?

A No, sir, I didn't say that.

Q One of the officers told you, you are not saying that because you are afraid, didn't he?

A Yes, sir.

Q You told them you have got the wrong man didn't you?

A No, sir, I didn't tell them that. I told them I didn't know, I could not identify the man.

Q How long after the shooting occurred was it when they brought him over there?

A When they brought him to my house?

Q Yes, when was it?

A It was on Monday.

Q Don't you recall telling them that they had the wrong man?

A   No, sir.

MR. DOWNING: We object, that is about 3 times he has answered that same question.

THE COURT: Yes, we have covered that.

Q   Which officers, who all was it that bought [sic] him over there?

A   Mr. Jack, he was there, the Sheriff, he was with them and he was there, Mr. Downing."

On cross-examination of Wyman Johnston, Jr., defense counsel elicited the following:

"Q   Could you identify anybody that was in that car?

A   No, sir, I couldn't.

Q   Wyman, did they bring you over to the jail and show you a fellow and ask you if that was who it was?

A   Yes, sir.

Q   What did you tell them?

A   I told them I did not know whether it was him or not.

Q   You told them you didn't know and you could not identify him?

A   That's right.

Q   Who all came with you when you came to the jail to look at this man?

A   Me, Odell, Rowena Hollingsworth, Junior Hollingsworth and I think James Haley came too.

Q   You did not identify him did you?

A   No, sir.

Q   Was this the man you were looking at?   (indicating the defendant)

A   I think it was him, it looks like him, the one they had in jail.

Q   He is the one you could not identify as pulling the trigger or being in the car over there?

A   Yes, sir."

On direct Junior Hollingsworth testified for the State, in part:

"Q   Can you identify this person?

A   Yes, sir.

Q   Who is he, is he in the Court room here?

A   That is the one with that blue shirt on there.   (indicating defendant)

Q   Did he have on glasses at that time Junior?

A   No, sir.

Q   You say this is the person that came out of the right side of that car with a pistol?

A   Yes, sir.

\*      \*      \*      \*      \*      \*

Q   Junion, [sic] I believe you testified this happened on Sunday Afternoon, is that right?

A   Yes, sir, on Sunday.

Q   Do you remember the following Monday when you identified this person?

A   Yes, sir.

Q   Where was this person at the time you identified him?

A   At the City Hall in Berry.

Q   Was I there?

A   Yes, sir, you was there.

Q   Was some of the Sheriff's forces there?

A   Yes, sir, I think they was there, that fellow there was there.

Q   Mr. Downing?

A   Yes, sir.

Q   At that time did you identify this person here as being the person that pulled the trigger?

A   Yes, sir."

On cross of this witness we find:

"Q * * * When they first ask you to come see if you could identify Bo Cannon, where was this?

A At the City Hall in Berry, after he shot the boy.

Q When you first seen him did you tell them that you could not be sure he was the one?

A I said that he was the one.

Q When you first saw Bo Cannon in Berry in the jail did you tell the other officer you could not be sure he was the one?

"MR. DOWNING: We object, he has said that, he has answered.

A I said it was him, Mr. Cannon was the one that shot him.

Q Do you recall when we took your testimony on May 22, 1969, soon after this occurred when he wasked [sic] you, Q. When you first saw him in Berry, referring to Bo Cannon, you answer was I could not be sure, and on 5–22 you said I am may [sic] but I changed it to be the one, he was the one that shot him.

A No, sir.

Q Do you recall that?

A I said that was the one that shot him.

Q I am asking you if you testified to this on May 22, 1969?

A In 1969?

Q I am asking you, did you testify when asked this: Q. When you first saw him in Berry, referring to Bo Cannon, did you make the statement I could not be sure he was the one and your answer on May 22nd. was: A. I may have but I changed and told them he was the one.

A I never said nothing like that. I said that was the man that shot him, I seen him.

Q You first went down and you could not be sure he was the one was aked you [sic] and you said you did not get a good look at him, do you recall that?

A When I first seen him I said it was him.

Q Do you deny making this statement when you testified earlier?

A I said that was him, if it wasn't it looked like him.

Q Do you deny making that statement when you testified her [sic] on May 22, 1969?

A I looked at him and said that was the man that shot him, if it was not him it looked like him.

Q Did you first tell them when they brought Bo Cannon over there that you could not be sure?

A He was a good piece from me.

Q Did you, in the first statement you made say that you could not be sure?

A I might have said it, I cannot remember make [sic] that statement.

Q As a matter of fact, after the shooting occurred when was the first time you talked to Sheriff Selma Sanford?

A I ain't talked to him.

Q Did you come to the hospital the night after the shooting occurred?

A No, sir.

Q Did you talk to the Sheriff and other officers that night?

A No, sir, I ain't talked to him.

Q You did not talk to him until they brought him over there for you to identify?

A They brought us to the jail house over here and the other boys didn't know him and they told me to look at him and when I looked I testified and told him that was the man that shot him.

Q Did the officers question you about the shooting at your house after it happened, before you came over to the jail?

A No officer did not come to my house.

Q You did not talk to any officer about what the person looked like before they brought a man over there to your house?

A I have not talked to any officer.

Q Did you talk to the Sheriff or his deputies at any time before they brought him over there?

A They had him at the City Hall in Berry and the told me to go in there and look at him and see if that was the man and I said yes, sir, that was the man. He was in the jail house over there.

Q What is your wife named?

A Rovena Hollingsworth.

Q Did the officers talk to you and Rovena and get a description of the man before they come over there?

A They didn't talk to me knowhere [sic] but at Berry and they asked me was that the man and that was the only time I talked to them.

Q When you first looked at him in the jail at Berry, that was the first time you looked at him?

A I got closer to him over here.

Q This was the first you saw him, at jail in Berry?

A Yes, sir.

Q And you were brought back to the jail over here to identify him?

A Yes, sir. He showed him to the other boys and that was the right one.

Q Did you make a statemend [sic] that the boy that did the shooting was blond headed?

A No, sir, I did not tell that.

Q MR. DAVIS: That's all.

RE DIRECT EXAMINATION

Q (Mr. Nolen) You know who pulled the trigger didn't you?

A Yes, sir, I knew.

Q It was daylight, wasn't it?

A Yes, sir.

Q And you saw who it was?

A Yes, sir.

Q And you told who it was?

A Yes, sir, I told all I know about it.

Q And it the defendant? [sic]

A Yes, sir.

MR. NOLEN: That's all."

On cross of Rovena Hollingsworth we find the following:

"Q How long in your opinion did you observe the man who got out of the Ford?

A I don't know.

Q In your best judgment?

A I don't know for sure, at least over a minute.

Q How was he dressed?

A I don't know.

Q You do not know how he was dressed?

A No, sir.

Q Did he have on a cap?

A No, he did not.

Q Did he have on glasses?

A No, sir.

Q And you do not know how he was dressed?

A No.

Q When did you first describe the individual that got out of the Ford to anyone?

A When they brought him over to the preliminary hearing.

Q That was in May the?

A That was the first time.

Q You did not tell then when he was down in Berry?

A No, I did not.

Q When this Ford pulled up behind the Pontiac how close did it get to the Pontiac?

A It was sorta angled to the Pontiac.

Q Did the Ford have to back up to leave?

A No.

Q Did the man have both feet on the ground?

A No.

Q He was in the car?

A No.

Q And the car was not moving?

A When he was standing out it was moving and he had both feet on the ground then.

Q You were never taken over to the City Hall in Berry?

A No.

Q Was your husband taken over there then and you talked with him about it?

MR. DOWNING: We object, she doesn't know what her husband did.

Q Did you have any conversation with your husband about him identifying anyone in Berry jail.

A No."

With the exception of the testimony of Junior Hollingsworth, the State relied only on in-court identification. Hollingsworth's latter quoted testimony can be viewed as an attempt by the prosecution to support this in-court identification. Haley and Johnston had both been cross-examined as to the confrontation with McGuff while in custody.

■ It is significant that defense counsel never asked any witness whether or not McGuff was attended by counsel. Accordingly, we consider that the principle of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 was not raised in the court below. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, is a companion case.

We think it is clear that the prosecution relied solely on the in-court identification by all four of the identifying witnesses. Heretofore in Robinson v. State, 45 Ala. App. 236, 228 So.2d 850; Hardy v. State, 45 Ala.App. 632, 235 So.2d 677; Ross v. State, 46 Ala.App. 88, 238 So.2d 887; and Chambers v. State, 46 Ala.App. 247, 240 So.2d 370, we cited with approval the procedural practice adopted in Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230.

■ Briefly that practice, where the prosecution only offers an in-court identification, requires that the defense challenge its admissibility. In the absence of such a challenge nothing is presented for review by either the trial or appellate court.

No challenge was made in the trial court; axiomatically the question cannot be raised for the first time on appeal. For aught that appears McGuff may have been offered (or had) a lawyer.

VI

■ As shown by Alabama Digest, Criminal Law, ⬥989, the decisions, without exception, require that, in a felony

conviction, the court must ask the convicted person if he has anything to say as to why the sentence of the law should not be imposed upon him.

The minute entry in the record sub judice does not reflect any such allocutus. This renders the judgment erroneous. Yet such error does not affect conviction. Rather the cause is due to be remanded to the circuit court for proper sentence. Thomas v. State, 280 Ala. 109, 190 So.2d 542.

Accordingly, the judgment of conviction is affirmed but the cause is ordered remanded to the court below for proper sentencing.

Affirmed: remanded for proper sentence.

All the Judges concur.

## ON REHEARING

CATES, Presiding Judge.

The Circuit Clerk at the direction of the trial judge has sent us an "amended" judgment which shows allocutus to the prisoner after the jury's verdict. The Attorney General has not, however, moved for a rehearing.

We cannot permit amendments of the record after submission. Huddleston v. State, 37 Ala.App. 57, 64 So.2d 90; Lipscomb v. State, 37 Ala.App. 379, 68 So.2d 862; and Saylor v. State, 42 Ala.App. 666, 177 So.2d 924.

We have carefully considered the briefs of appellant's counsel on rehearing and consider that Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 and Supreme Court Rule 45 are authority for overruling the application.

Opinion extended; application for rehearing overruled.

All the Judges concur.