301 So.2d 230

**Leamon Ray PRICE**

**v.**

**STATE.**

**7 Div. 269.**

Court of Criminal Appeals of Alabama.

July 30, 1974.

Rehearing Denied Oct. 1, 1974.

John W. Norton, Anniston, for appellant.

Claude M. Burns, Jr., Sp. Asst. Atty. Gen., Tuscaloosa, for the State.

HARRIS, Judge.

Appellant was indicted for murder in the first degree. He was convicted of murder in the second degree and his punishment fixed at imprisonment in the penitentiary for a term of forty (40) years. He had retained counsel at arraignment and trial. After conviction, he was declared indigent for the purpose of obtaining a free transcript, but trial counsel represents him on appeal.

The homicide was committed around 8:30 P.M. on June 28, 1972, at the home of the deceased in the Ball Play Community of Etowah County. The deceased and his wife operated a combination grocery store and service station and their home was a short distance from their store, known as the E. C. Pike Grocery. On the night of the killing, Mr. and Mrs. Pike closed the business at 8:00 P.M. and went home for supper. Their food was already prepared and they were through eating at 8:30 P.M. and went to the front porch where they occupied two porch or lawn chairs. According to the testimony of Mrs. Pike, they had been on the porch about an hour when two white men came around the house from the rear and one of the men, whom she later identified as the appellant, said, "Get in the house and no one will get hurt." She was sitting in a chair next to the front door and she got up and started in the house. The other man, later identified as James Helton, came upon the porch and took her by the arm as she was going in the house. Mrs. Pike looked back over her shoulder to see if her husband was following her and saw him half rise from his chair and saw appellant move closer to the porch with a pistol in his hand, saying, "All right, ——— ——— you." Helton told Mrs. Pike to "Get in the bathroom." Just before she reached

the bathroom she heard two shots fired, and Helton immediately ran out of the house. Upon hearing the shots, Mrs. Pike froze for a few seconds. She went to the stereo and got her husband's pistol and ran out front. She did not see appellant or Helton but saw her husband lying on the ground near the front porch. She did not go to her husband and feel his pulse but looked at him and thought he was dead. She ran up the road to John Bussey's house to get some one to call an ambulance, the sheriff, and her sister. Mr. Bussey was not at home but Mrs. Bussey made the telephone calls. Mrs. Bussey went back to the Pike home with Mrs. Pike. There were several neighbors closer than the Busseys but Mrs. Pike did not go to these houses. The Busseys had lived in the neighborhood for six or eight months during which time Mrs. Pike had never been to their home. More will be said about this later.

When Mrs. Pike and Mrs. Bussey got back to the Pike home several people had already gathered there. Shortly a deputy sheriff arrived and took the pistol from Mrs. Pike. It is undisputed that this pistol had not been recently fired. The coroner of Etowah County, Noble Yocum, arrived and examined Mr. Pike and declared him dead at the scene. The coroner observed two wounds on the body, (1) just below the right upper jaw and (2) in the right pubic area about the hairline in the groin. The first bullet wound did not exit but the second one did. Photographs were made of the body and the scene of the crime and admitted in evidence without objection. The body was removed to a local funeral home where an autopsy was performed by Mr. Van Pruitt, Jr., Assistant State Toxicologist. The coroner further testified that the area around the Pike home and store was fairly well lighted with two mercury vapor lights on poles. Mrs. Pike testified there was one vapor light at the house and two at the store and that the livingroom lights were on and the drapes pulled back; that these lights fairly lit up the entire area.

The toxicologist testified that upon external examination of the body, he found:

"At the time that I first viewed the body it was undressed. It had been arterially injected. The body was noted to be that of a caucasian male; the height was measured at six feet, and the weight was estimated as between 200 and 220 pounds; the build of the individual was judged to be that of a person of medium build; the head hair was gray, heavily interspersed with black. I did not see any evidence of amputation of any of the extremities; no identifying tattoos. I made note of the following injuries to the body, and the order in which these are listed is not necessarily inferring the order in which they were sustained, but merely the order in which I made note of them: there was present in the right cheek slightly above the corner of the right jaw a hole which measured one half inch in its diameter surrounded on its upper periphery or upper aspect by a dark area of powdered residue with powdered flakes measuring three quarters of an inch in its breadth. There was present in the lower right pubic area a hole which measured one half inch in its diameter and was likewise surrounded in its upper border, and in a somewhat fan shaped pattern by a dark area of powder residue and powder flakes measuring three quarters of an inch in its breadth. There was a hole on the back of the right upper leg right below the right buttocks which measured one quarter inch in its diameter and was rather irregular. Palpation determined the right jaw to be fractured."

The internal examination was described as follows:

"Based upon the internal examination of the body it would be my opinion that death occurred as the result of two gunshot wounds sustained to the body; one to the right cheek resulting in injury to the vessels of the neck, and the left side of the body, and one which occurred in the right pubic area, low abdomen, which

resulted in injury to a major artery and a major vein in the upper leg portion, and the hemorrhage that occurred as a result."

The toxicologist further testified there were "powder residue" and "powder flakes" around each entrance wound and it was his opinion that the muzzle of the pistol was in near contact, approximately six (6) inches, to the body of the deceased.

The investigating officers found a slug on the door mat at the front door of the Pike home and this slug was delivered to the toxicologist. The toxicologist removed another slug from the body of the deceased. He made a microscopic examination of these two slugs and expressed the opinion they both were fired from the same barrel.

A state investigator test fired four cartridges from the pistol that a deputy sheriff took from Mrs. Pike's hand the night of the homicide and delivered the slugs to Mr. Van Pruitt. It was Mr. Pruitt's opinion that while these four slugs and the two slugs that entered the body were similar in their class characteristics, their microscopic markings were grossly different. He said:

"It is my opinion they were not—that the four slugs which I received from Captain Davis were not fired through the barrel of the same weapon as the slugs which I recovered from the body of Elmer C. Pike, or the slugs which Captain Davis turned over to me and identified as having been found at the scene."

Two state witnesses, Mildred Davis and Martha Reeves, testified that on the night of the homicide they were in Mrs. Davis' car at a point about three miles from Pike's store and while stopped for an intersection lighted by a mercury vapor light an automobile passed directly in front of them going in the direction of Pike's store. Mrs. Davis identified appellant as one of the occupants of the car. Mrs. Davis described the car as "a green car; it was a

Ford product; and it had square tail lights, side mirrors and headrests." They followed this car for about a mile but did not get the tag number. She was asked to look in the courtroom and see if she could identify anyone. With some hesitation and upon being prodded by the district attorney to "show, show—point", she pointed and the district attorney said:

"Q. This man right here in the blue trousers and blue shirt, black hair. That is your best judgment.

"A. Yes."

Mrs. Davis described the other male occupant of the car as a blonde headed or sandy headed man. On cross-examination she was asked if she could definitely say the man she saw in the car that night was in the courtroom and replied, "not definitely; but it looks like him."

Mrs. Davis was asked if she had seen that automobile since that night and she answered in the affirmative saying she had seen it at the courthouse in Gadsden. She was shown three photographs of an automobile, State's Exhibits 12, 13 and 14, and testified that the automobile looked like the same car, and that in her best judgment it was the same car.

It developed during the trial that this automobile actually belonged to Shirley Helton, the wife of appellant's co-defendant, who lived in Huntsville, Alabama. After Mr. Helton was arrested and lodged in the Etowah County jail, Mrs. Helton drove this automobile to Gadsden to visit her husband and parked it in the parking lot at the courthouse. While it was so parked the officers took the photographs—State's Exhibits 12, 13 and 14.

Miss Reeves' testimony was even less convincing than Mrs. Davis' testimony. She described the automobile in the same way that Mrs. Davis did. Miss Reeves thought it was a Ford Torino. It was actually a Mercury. She described the occupants of the car in this manner: "Well, one of them was black headed, and the

other one was blondish headed. Both of them were kind of built, big built."

A line-up was conducted and Mrs. Pike attended, but the trial court ruled the line-up was illegal and suppressed the identification. Mrs. Pike was shown numerous mug shots but was unable to identify anyone in the first stack exhibited to her. Later she went to the office of the county investigator where she was shown another stack of mug shots and she picked out appellant as the man who had the pistol at her house on the night of the killing and ordered her and her husband to go in the house. For some reason the trial court sustained appellant's objection to this method of identification. The case was put to the jury on Mrs. Pike's identification of appellant at her house the night in question and on her positive in-court identification.

The state's case on the identity question leaves much to be desired, but we cannot say the identity issue was insufficient to submit to the jury.

■ Appellant's defense was an alibi and he made a strong case. This, too, presented a jury question and that issue was resolved against him.

Mrs. Pike was subjected to a vigorous cross-examination and her testimony was impeached in at least two respects. She was accused of having an affair with a man in the local community. She denied the affair and denied she was ever alone with this man at any time. Defense counsel produced one witness who testified that two months prior to the homicide she and this man were behind the counter engaged in a conversation standing about a foot apart. They were in the store alone.

She also denied that her husband had ever talked to her about a divorce. It seems that the man she was seen with in the store wrote her a love letter and stuck it in the windshield and it was found by her husband. He became extremely upset about the letter and a divorce was mentioned, but went no further than a discussion.

It was generally known that the deceased was in the habit of carrying large sums of money on his person and after he was shot there was five or six hundred dollars found in his wallet. It was the state's theory that robbery was the motive for the killing but that after the shooting the robbers panicked and fled the scene before they accomplished their purpose.

It was shown by counsel for appellant that there was a policy of insurance on the life of Mr. Pike and that Mrs. Pike was the sole beneficiary. Interlaced in the cross-examination of Mrs. Pike were strong intimations that she was not too concerned about the welfare of her husband after the shooting because she did not go to him and render any aid. She did not even speak to him; that instead of going to the nearest house for help she went to a house which was over a hundred yards away, thereby giving him more time to die so that she would be free to enjoy the proceeds of the life insurance policy in the amount of $10,000.00 and pursue her newly acquired interest that took root in the store that gave rise to a discussion of a divorce. At least those are the insinuations we gather from the record.

Since the trial court ruled out all evidence pertaining to a line-up this case is not controlled by the cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178.

The trial court ruled out the mug shot identification and left the state with the in-court identification made by Mrs. Pike plus her identification of appellant when he came to the Pike home on the night of the homicide, in addition to the testimony of Mrs. Davis and Miss Reeves. The testimony of Davis and Reeves put appellant in the vicinity of the Pike home thirty minutes before the homicide.

**470**

There is no contention in this record that the in-court identification of appellant was tainted by the line-up view or the mug shot identification. Where the prosecution relies solely on an in-court identification the defense must challenge the admissibility of such identification. McGulff v. State, 49 Ala.App. 88, 268 So.2d 868.

■ We do not find that the in-court identification in this case offends the Due Process Clause of the Federal Constitution. Dawson v. State, 47 Ala.App. 293, 253 So. 2d 362; Havard v. State, 50 Ala.App. 147, 277 So.2d 421.

■■ As we have indicated the state's case leaves a lot to be desired in a criminal prosecution. Appellant proved a strong alibi. As we said in Haggler v. State, 49 Ala.App. 259, 270 So.2d 690:

"[But] where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value is for the jury. Bolton v. State, 21 Ala.App. 373, 108 So. 631."

■ While we are not impressed with the strength of the state's case on the identity question, there is no way we can reach that issue. There was no motion to exclude the state's evidence and no motion for a new trial. There was no request for the affirmative charge and no exceptions reserved to the oral charge. Most of appellant's objections to the introduction of the evidence received favorable rulings from the court. In this state of the record nothing is presented for review on appeal. Robinson v. State, 44 Ala.App. 206, 205 So.2d 524; Eady v. State, 48 Ala.App. 726, 267 So.2d 516.

The refused charges were adequately and substantially covered in the court's oral charge or in the charges given at the request of appellant.

We find no reversible error in the record.

Affirmed.

All the Judges concur.