Appellant was convicted of assault with intent to rob and sentenced to 15 years imprisonment in the penitentiary. Following the verdict and sentence, appellant gave *Page 13 
oral notice of appeal. The Court, finding appellant indigent, appointed counsel of record to represent appellant on appeal.
Subsequently, appellant, stating numerous grounds, moved for a new trial. In part, appellant contended that the verdict was contrary to the evidence adduced at trial. The trial court denied this motion.
The evidence shows that around midnight on Friday, August 27, 1976, two young black males, Danny Harris and Jessie McGee, approached the self-service Shell Station on the corner of 13th Street and McFarland Boulevard. Miss Carol Brown was the attendant on duty. Daniel Harris purchased a pack of Kool cigarettes from her. At that time Jessie McGee pushed a pistol through the cashier's window, told Miss Brown that this was a holdup, and demanded that she place all the money in a bag. While gathering up the money from the cash drawer, before giving any money to these assailants, Miss Brown was shot by McGee.
Immediately before McGee shot Miss Brown, two Alabama State Troopers, Buddy Knight and Jerry Elliot, stopped at a red light at the intersection of 13th Street and McFarland Boulevard. Buddy Knight saw McGee and Harris "standing shoulder to shoulder pushed up real close to the pay window."
The troopers drove into the station lot just as McGee shot Carol Brown. Knight jumped out of his car, shouting at McGee and Harris to "Freeze." McGee raised his pistol and Knight fired several shots, one of which struck McGee in his leg. Harris ran and Elliot chased him, losing him in a wooded area nearby.
Knight recovered the pistol used by McGee and turned it over to Don Lake, a detective on the homicide squad. Lake recovered a spent projectile inside the cashier's booth. Both the gun and the projectile were turned over to Jim Britton, a State Toxicologist. Britton conducted ballistics examinations, subsequently, concluding that the projectile was fired from the weapon used by McGee.
Leigh McGee testified that she was the mother of Jessie McGee. Mrs. McGee had known appellant approximately two years prior to this incident. Appellant and McGee were close friends. On the evening of the robbery, Mrs. McGee testified, appellant came to her home on three occasions.
At approximately 8:30 p.m. on Friday, appellant came over to the McGee home with Jessie McGee and Daniel Harris. Appellant asked Mrs. McGee to cook them a frozen pizza which he had brought with him. Appellant, McGee and Harris then left.
Mrs. McGee stated that at approximately 10 o'clock, appellant, her son and Harris came back and ate the pizza. After eating the pizza these three left again. They did not tell Mrs. McGee where they were going.
Mrs. McGee left her house shortly afterwards on an errand. When she returned home, her son and Daniel Harris were there. About 11 o'clock p.m., Mrs. McGee stated, appellant drove up to her house and honked the horn in his car. Her son and Daniel Harris went out to the car. Mrs. McGee heard appellant say, "Are you all ready?" Her son answered, "Yeah." Appellant and the two boys then drove off.
Approximately at 12:30 a.m., Saturday morning, appellant returned alone to Mrs. McGee's house and asked her if her son and Daniel had "made it home." When she told appellant they had not, he replied that he had dropped them off at Brother's Lounge.
Subsequently, Don Lake and Sergeant Billy Bigham of the Tuscaloosa Police Department arrived at Mrs. McGee's home. After talking with Mrs. McGee, the officers spoke to Jessie McGee's wife. Following this conversation the officers went to an apartment on 25th Avenue and spoke with appellant.
Billy Estes, also a Tuscaloosa Police Officer, was with Lake and Bigham at this time. He informed appellant of his Miranda
rights. Appellant stated that he understood these rights and said he would talk to them. The police officers informed appellant of the attempted robbery at the Shell Station. *Page 14 
Appellant at that time said that some time after 11:00 p.m., he had gone by Jessie McGee's residence and asked if he and Danny wanted to go get a pizza with him.
Lake then asked if appellant would come down to the police station to give a formal statement. Appellant agreed. He and the officers then left in Lake's patrol car.
In the patrol car, appellant said he "wanted to come clean of everything that he knew about the case," and wanted to show where he dropped off McGee and Harris. Appellant took them to theentrance to Delaware Jackson Apartments, telling them that McGeeand Harris told him that they were going to a party. Appellant then said he went to his nephew's house down on the Eutaw Highway.
Lake, the other officers, and appellant then went to the police station. Lake again advised appellant of his Miranda rights. Appellant executed a Miranda waiver form. Appellant then gave another statement.
Appellant said that he was on his way to get a pizza and on his way picked up McGee and Harris. McGee and Harris were talking about "pulling a job." McGee and Harris wanted him to wait while they committed the robbery. Appellant said he "felt like they were going to hit the station at Thirteenth and McFarland because there wasn't anything else open around there in the vicinity." Appellant stated that he let McGee and Harris out at the WestAlabama Rehabilitation Center.
Appellant said that Tuesday he had seen a gun over at Jessie McGee's. Appellant further stated that it had been in his car. Appellant saw the imprint of a gun in McGee's pants leg on the night of the robbery.
After appellant let McGee and Harris out of the car he stated that he did go over to Mrs. McGee's house. When asked by Lake when he finally got home, appellant gave no answer.
Appellant told Lake that McGee had been saying he needed money because he was going to Germany in the Army. This conversation, appellant said, started a couple of days prior to the attempted robbery. "I knew they were going to do something a day or so — days or so. Junior was worrying me about needing some money . . ."
As soon as McGee and Harris got in the car at McGee's residence, appellant said, they started talking about a robbery. McGee reached under the seat of the automobile when he got in.
Appellant said he had handled the gun before but he didn't know how long it had been in the car. McGee had told him that he had got it from a "young dude" known as Preacher.
Billy Estes testified that he had a conversation with appellant later on the morning of August 28, 1976. Estes also advised appellant of his rights again. Appellant wanted to make another statement.
At 11:00 p.m. appellant said, he picked up his wife from work and carried her home. Appellant's wife wanted to know what he had for supper and he told her a pizza. He left to go get his wife a pizza because she wanted one. Appellant went by McGee's house, blew the horn, and saw McGee and Harris come out. They wanted to go with him appellant said.
Appellant told Estes that Tuesday McGee had got a gun from "Preacher." This gun was "rusty and nasty." Appellant said McGee cleaned up the gun and asked if he could leave it in his car. Appellant agreed.
Then when appellant picked Harris and McGee up, he said he needed some gas. He drove down McFarland Boulevard and turned left on 13th Street. "I knew something was coming down. I didn't know what, when or where."
Appellant said McGee got the gun and tucked it in his belt. McGee said, "Look, it's a black girl, this is my place." McGee and Harris said to wait on them. Appellant said he "put them out at some apartments on the left and they walked back, and I took off."
Later appellant went over to Mrs. McGee's and asked her if "they had made it back . . . I told her that I dropped *Page 15 
them off at Jim's Lounge . . . I told Junior's mother a lie about putting them off at Jim's Lounge."
At trial, over appellant's objection, the testimony of Bobby Hunter who testified at a preliminary hearing for this case was admitted into evidence. Hunter was unavailable to testify, since he was stationed out of state with the Army, undergoing basic training.
At the preliminary hearing, Hunter testified that appellant was his uncle. He stated that a few days prior he had given appellant a gun to sell for him. Appellant said he didn't want it; but he took it and placed it in his car. Hunter said the pistol had belonged to Jerome Guyton, who was known as "Preacher." Hunter found the pistol in a playground under a merry-go-round. Hunter identified a weapon shown him at the preliminary hearing to be the same as the pistol which he gave to appellant.
Counsel for appellant stipulated at trial that the pistol exhibited at the preliminary hearing was the same as that pistol offered in evidence by the State at trial.
Appellant took the stand in his own defense. Among other things he stated he had picked his child up at 8:30 p.m. and gone directly home. He said he had had a pizza earlier at McGee's. But he didn't see McGee or Harris until after 11 o'clock p.m., when he picked them up on his way to get a pizza for his wife.
Appellant testified he drove down McFarland Boulevard to get some cheap gas. Harris said, "It's a black girl over there, and she is by herself." McGee told him, "Jabbo, stop the car. This looks like a good place to set up. This looks like a good place to rip off." When asked to wait when McGee and Harris got out of the car, appellant said, "Well, like, I am going to get my wife. You know how she is."
Appellant denied having any knowledge beforehand that McGee was going to "rip off" any place.
On the stand, appellant admitted that he let McGee and Harris out on 13th Street. He also admitted that he had gotten the weapon used in the robbery attempt from Bobby Hunter.
Appellant stated when he received the gun from Hunter, he showed it to McGee. McGee told appellant he could clean the weapon. Appellant testified that he told McGee "Well, if you can find anybody that will sell it, sell it for whatever you can." On Thursday, appellant testified, McGee said this gun belonged to "Preacher," and that he would keep the gun. At this time McGee showed appellant that he had cleaned the gun. "I said, yeah, it looked pretty good. And I told him to put it under my right seat . . . And that is where he put it, under there."
The District Attorney's cross-examination of appellant was scathing. Appellant had testified that his wife wanted to know what he had for dinner, because there were no dishes in the sink. On cross-examination, appellant was asked if he hadn't told Don Lake in one statement that he got home, watched the Midnight Special and washed the dishes at 1:00 a.m., Saturday morning. Appellant didn't recall.
Further, from the record:
 "Mr. Andres — Q: And you told Mr. Lake and Mr. Cooper that you had already stopped by Pasquale's and noticed that they were closed before you let Danny and Junior out; is that right?
"A. Yes, sir.
"Q. And that was a lie?
"A. Yes, sir.
* * * * * *
 "Q. . . . I believe you said that you let Danny and Junior out at the Rehab there?
"A. Yes, sir.
* * * * * *
"Q. Was that also a lie, Mr. Simmons?
"A. Yes, sir.
* * * * * *
 "Q. They (Lake and Cooper) certainly didn't find out that the gun had come from Bobby Hunter from what you told them, did they? *Page 16 
"A. (No audible response)
 "Q. You never told them that the gun came from Bobby Hunter, did you?
"A. No, sir.
* * * * * *
 "Q. Danny and Junior were not going to a party at Delaware Jackson Apartments, were they?
"A. No, sir."
The above excerpts from the record are only a few examples of appellant's self-contradiction on the stand. The conflicting statements given to police officers speak for themselves.
It is well established that circumstantial evidence is entitled to the same weight as direct evidence provided it points to the guilt of the accused. Locke v. State, Ala.Cr.App., 338 So.2d 488;Creel v. State, 53 Ala. App. 504, 301 So.2d 267; Hollenquest v.State, 53 Ala. App. 501, 301 So.2d 264.
The record reflects numerous circumstances that destroy the credibility of appellant's claim of innocence. (1) The appellant was with McGee and Harris on the night of the attempted holdup. (2) At 11:00 p.m. appellant picked up Harris and McGee, asking them, "Are you all ready?" (3) Appellant appeared at McGee's house about 12:30, only a half hour after the attempted robbery and asked if McGee and Harris "had made it home?" (4) Only a few days before the robbery attempt, appellant was given the gun which was used by McGee at the Shell Station. (5) Appellant gave this gun to McGee to clean. (6) Appellant later had McGee place the weapon in his automobile. (7) Appellant admitted he let McGee and Harris out at the Shell Station, not at the Rehabilitation Center, nor at Delaware Jackson Apartments as he maintained at various times. (8) Appellant stated that he had known something was "coming down" for several days before the incident occurred.
In Johnson v. State, 57 Ala. App. 470, 329 So.2d 160, this Court said:
 "Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value are for the jury. Haggler v. State, 49 Ala. App. 259, 270 So.2d 690; Price v. State, 53 Ala. App. 465, 301 So.2d 230; Hawkins v. State, 53 Ala. App. 89, 297 So.2d 813; Moore v. State, 52 Ala. App. 394, 293 So.2d 309."
It is well settled that proof of the corpus delicti may be established by circumstantial evidence. James v. State,22 Ala. App. 183, 113 So. 648; Butler v. State, 54 Ala. App. 468,309 So.2d 505; Hollenquest v. State, supra.
It is not within the province of the Court of Criminal Appeals to pass judgment on the truthfulness or falsity of conflicting evidence. Snipes v. State, 50 Ala. App. 139, 277 So.2d 413.
Donald Atkins testified on behalf of the appellant at trial. He stated that he stopped by appellant's house some time after 11:00 p.m. to ask appellant to go to the Citizens Club. He also stated he heard a conversation between appellant and his wife concerning a pizza. However, when Atkins was asked to relate the content of the conversation, the Court sustained the State's objection that the question called for hearsay.
Appellant contends that the Court erred in refusing to allow Atkins to testify to a conversation in which he heard the appellant state his purpose for going on a journey in which the charged crime occurred. Sellers v. State, 37 Ala. App. 318,68 So.2d 65 (1953); Davis v. State, 188 Ala. 59, 66 So. 67 (1914);Maddox v. State, 159 Ala. 53, 48 So. 689 (1909).
Appellant states a correct proposition of law. What a person says on setting out on a journey, or when starting to go to a particular place, explanatory of the object he had in view in so setting out, is res gestae evidence. This may be proven to shed light upon his motive, intent or acts, Sellers, supra. *Page 17 
However, this principle is not dispositive of the case at bar. Here appellant and his wife testified to appellant's purpose in leaving his home on the evening the incident occurred. Atkins' testimony would only have been cumulative and repetitive. Where error, if any, is committed by ruling evidence inadmissible, the error is cured by subsequent admission of the same evidence. Tatev. State, Ala.Cr.App., 337 So.2d 13 (1976); Lovell v. State,51 Ala. App. 286, 284 So.2d 741 (1973); Griffin v. State, 49 Ala. App. 502, 273 So.2d 478, cert. denied 290 Ala. 366, 273 So.2d 481
(1972).
In the charge to the jury, the Court originally included the lesser offense of assault and battery. Upon the State's exception to the conclusion of the assault and battery, the Court withdrew that part of the charge from the jury's consideration.
Appellant relies upon Taylor v. State, 48 Ala. App. 443,265 So.2d 886 (1972), as basis for his contention that the trial court erred in withdrawing that charge. There the trial court instructed the jury to find defendant guilty of robbery or not at all, having previously instructed them that an indictment for robbery included the lesser offense of larceny, assault with intent to rob, and assault and battery.
Where the only reasonable conclusion from the testimony is that defendant is guilty of robbery or not guilty of any crime whatever, he is not entitled to a charge on lesser included offenses. Carter v. State, Ala.Cr.App., 340 So.2d 94 (1976);Impson v. State, Ala.Cr.App., 331 So.2d 837 (1976).
Appellant states that if the jury believed the testimony of Carol Brown, the victim, and didn't believe the testimony of Danny Harris, an accomplice; then, there is a reasonable inference from the evidence that there was no intent to rob, but merely an assault and battery. Appellant notes that Miss Brown was shot before she handed the money over. However the evidence is undisputed that McGee and Harris told Miss Brown that this was a holdup and to put the money in a bag. Although appellant denied any knowledge beforehand that a robbery would be committed, the appellant testified that McGee and Harris were talking about pulling a job.
The Court did not err in withdrawing the charge of assault and battery from the consideration of the jury. Carter and Impson, supra.
Finally appellant urges that the trial court fell into error by qualifying several charges requested by appellant, which the Court read to the jury. Such a modification of a defendant's requested charges is prohibited by Code of Alabama, Title 7, Section 273, and constitutes reversible error. St. John v. State,55 Ala. App. 95, 313 So.2d 215, cert. denied 294 Ala. 768,313 So.2d 218 (1975); Bryer v. State, 34 Ala. App. 561, 42 So.2d 496
(1949).
The following requested charges of appellant were given by the trial court:
 "The Court charges the jury that in order to aid and abet another to commit a crime, it is necessary that the accused associate himself with the venture with knowledge that an offense is to be committed and share in the criminal intent, and unless the State has proved each of these elements from the evidence beyond a reasonable doubt, you must find the Defendant not guilty.
 "The Court charges the jury that before you can convict the Defendant, you must be convinced by the evidence beyond a reasonable doubt and to a moral certainty that the Defendant, by prearrangement or on the spur of the moment, entered upon a common enterprise or adventure with Jessie McGee or David Harris, and that a criminal offense was contemplated. I said David Harris, I believe it was Daniel Harris.
 "The Court charges the jury that in order to render a person an accomplice, he must be aiding and abetting at the time of the crime or ready to afford assistance if necessary. And that unless you are convinced from the evidence beyond a reasonable doubt and to a moral certainty that Defendant, Jessie Simmons, aided and abetted at the time of the offense or *Page 18 
was ready to afford assistance if necessary, you must find him not guilty."
Following the reading of the immediately preceding charge, the Court stated:
 ". . . And I want to add further in my Charge that it is not necessary that the Defendant be at that place and waiting or there. You have heard the evidence. If he put them out there, and he knew what they were going to do and had a — and you are satisfied beyond a reasonable doubt that he knew what was going to happen, and although he drove off later — or to come back and pick them up, that is for you to decide; but he could be just as guilty as the one that actually pulled the trigger that said this is a holdup."
Then the Court continued with giving appellant's requested charges:
 "The Court charges the jury that merely being at or near the scene of a crime, even without raising the hue and cry, does not make a man an aider or abettor. And that if you believe from the evidence that this was the extent of the involvement of Jessie Simmons, you cannot convict him.
 "The Court charges the jury that when the perpetration of a crime has been entered on, one who aided and encouraged its commission may before its completion, withdraw all his aid and encouragement and escape criminal liability for the completed felony. And if you find from the evidence that Jessie Simmons was an aider and abettor but did everything practical to detach himself from the criminal enterprise, you cannot convict the Defendant."
Appellant excepted to the Court's statement made during the giving of his requested charges. He now claims that this statement constituted a qualification of the written charge.
Bryer, supra, also holds that Title 7, Section 273, Alabama Code, does not prohibit the trial judge from explaining to the jury the legal purport of the charge, provided in so doing he does not qualify the tendered instruction. See Milam v. State,29 Ala. App. 494, 198 So. 860 (1940).
Here the Court's oral statement amounted to nothing more than an explanation, and thus was permissible.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.