The defendant was indicted for the first degree murder of his wife. A jury convicted him of murder in the second degree and fixed sentence at ninety-nine years' imprisonment.
 I
At trial the State introduced statements made by Mrs. Voudrie, the defendant's wife, to the police after she had been shot. The defendant contends that this testimony did not qualify as a dying declaration because Mrs. Voudrie exhibited "no settled hopeless expectation of impending death."
The uncontradicted evidence shows that on February 2, 1977, the defendant and his wife were divorced. Early Sunday morning, March 21, 1977, the defendant shot Mrs. Voudrie with a .25 caliber semiautomatic pistol. Mrs. Voudrie sustained at least five but not more than seven separate gunshot wounds. The actual cause of death was shock and hemorrhage due to these multiple gunshot wounds.
The approximate time of the shooting was never definitely established by direct testimony. However, almost immediately after the shooting[1], the defendant telephoned *Page 250 
the operator and requested emergency services. While the defendant was trying to help his wife she told him, "Oh, my God, please don't let me die." The defendant responded, "Kay, I am doing everything I can for you, honey." There is no showing of the exact amount of time that elapsed from the time the defendant telephoned the operator until the police arrived. However, there is no contention that this delay was significant.
Officer Dexter Ray Alexander of the Homewood Police Department received a radio dispatch at approximately 2:15 that Sunday morning. About two minutes later he arrived at Mrs. Voudrie's home. Approximately two minutes after that Mrs. Voudrie told him, "Don't let me die, please don't let me die." Officer Alexander, who was trained as a paramedic, stated that Mrs. Voudrie was "very upset." He tried to calm her down and comfort her in order to prevent her from causing further physical damage. He told her that they were doing everything they could and that help was on the way. After she "calmed down somewhat" he asked her what had happened. Officer Alexander testified:
 "She told me that her ex-husband had given her a gun to use for her protection; that he had come back and he had asked to have the gun back and that she didn't want to give it to him but she was afraid of him; that's why she stayed married to him as long as she did. She finally gave him the gun and the bullets and he started counting out the bullets and she asked him why he was counting out the bullets; and he said because I am going to shoot you and then she said he shot her."
After Mrs. Voudrie made this statement, the fire department arrived and Officer Alexander let them take over.
Officer David William Slimp of the Homewood Police Department arrived at the scene at approximately 2:17 A.M. — the same time as Officer Alexander. As he approached Mrs. Voudrie she said, "Help me, don't let me die." When asked by defense counsel on cross examination to describe Mrs. Voudrie, Officer Slimp stated: "She was hurt. She was afraid she was going to die." Slimp tried to help and console her. He testified, "I told her I wasn't going to let her die. That she would feel bad in the morning but that I was going to pull her through." In response, Mrs. Voudrie "just kept asking me not to let her die." Officer Alexander and Harold Cooley were also present and she was talking to them: "not to let her die — she didn't want to die." She repeated this "five or six times at least."
Dr. Michael Garnet Stultz first saw Mrs. Voudrie at 3:00 on Sunday morning at the University Hospital Emergency Center in Birmingham. He stated that she had been critically injured, was in a profound state of shock and required immediate surgery. In the operating room, Mrs. Voudrie suffered a cardiac arrest. Attempts were made to resuscitate her for a period of two hours. She was pronounced dead at 5:47 A.M.
The medical records from University Hospital state that Mrs. Voudrie "arrived in the Emergency Room with profound shock minutes after sustaining multiple small caliber gunshot wounds to the right neck, left flank, mid torso level about the 10th rib and posterior axillary line and also both right and left anterior thighs proximal to the knees."
A dying declaration is:
 "a statement by a person who believes that his death will certainly occur soon. He must be gripped by that despair of life which is naturally produced by an impression of almost dissolution, a dissolution so near as to cause all motives of falsehood to be superseded by the strongest inducements to strict accuracy. It has been said that the declarant, when making the statement, must have been in settled, hopeless expectation of impending death." C. Gamble, McElroy's Alabama Evidence, § 248.01 (1) (3rd ed. 1977).
In determining whether a statement qualifies as a dying declaration, the court must determine the state of the declarant's mind when the declarations were made.
 "The purpose of the court should be to arrive at the state of the declarant's mind *Page 251 
when the declarations were made, taking into consideration all that was said by him, and the surrounding circumstances of the case, including the nature of the inquiry which produced decedent's death, and his probable appreciation of its fatal character. The inquiry is, were such declarations uttered under the sense of impending dissolution, — under the solemnity of the conviction that death was near at hand, and that there was no hope of the declarant's recovery? Was he fully conscious of the fact that he could not rally from the effects of his injury, — so that he entertained no expectation of ultimate recovery? If this be true, then what he said under this conviction, — this despair of recovery, — touching the homicide and its attendant circumstances, which carried with it all the solemnity of a sworn declaration, is admissible, although in point of fact there was no rapid succession of death, and no apprehension of such event immediately following." Hussey v. State, 87 Ala. 121, 127-8, 6 So. 420, 422 (1888).
The fact that witnesses tell the declarant that he is not going to die, does not render the dying declaration inadmissible.
 "A statement by another person, usually a physician, to the declarant that he was not going to die would not necessarily support an inference that the declarant was not conscious of imminent death, where he has himself been shown, by his own words, his conduct, the seriousness of his injuries or of his condition, or by other relevant circumstances, to have entertained no hope of recovery when he gave his dying declarations." Annot., 53 A.L.R.3d 1196, 1242 (1973).
In this state, the rule was stated in Hall v. State, 12 Ala. App. 42,67 So. 739 (1915), relying on Hussey, supra. Compare withShiflett v. State, 262 Ala. 337, 343, 78 So.2d 805 (1955).
 "The fact that the physician attending deceased expressed to him a hope and belief that he would recover does not render the dying declaration inadmissible; provided the deceased believed himself to be in extremis, which he in fact was." Hall, 12 Ala. App. at 43, 67 So. at 739.
"[A]ccording to the clear preponderance of authority if deceased had the slightest hope of recovery when the declarations were made they are inadmissible." 40 C.J.S., Homicide § 290 (1944). See Ratliff v. State, 19 Ala. App. 505, 507, 98 So. 493
(1923) ("in the absence of all hopes of recovery"). However, "it is possible that, even where declarant expressed an opinion that he would recover, the circumstances may distinctly show that such was not his real belief." 40 C.J.S., Homicide § 295 (1944).
Wigmore states:
 "[T]he belief must be, not merely of the possibility of death, nor even of its probability, but of its certainty."
* * * * * *
 "The essential idea is that the belief should be a positive and absolute one, not limited by doubts or reserves; so that no room is left for the operation of worldly motives." V Wigmore § 1440 (3rd ed. 1944).
* * * * * *
 "In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances."
* * * * * *
 "No rule can here be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances." V Wigmore § 1442, quoted with approval and followed in Evans v. State, 209 Ala. 563, 565, 96 So. 923 (1923), and Parker v. State, 165 Ala. 1, 9, 51 So. 260 (1909).
See also Williamson v. State, 57 Ala. App. 113, 116, 326 So.2d 303
(1976).
Mrs. Voudrie's plea was one that perhaps almost any person in her condition would have made. Those statements, in conjunction with the circumstances of this case, including the severity of her condition, are sufficient to show that she had a settled, *Page 252 
hopeless expectation of impending death. See Commonwealth v.Spear, 2 Mass. App. 687, 319 N.E.2d 455 (1974) ("Please, officer, don't let me die. Don't let me die.") The statements made by Mrs. Voudrie were properly admitted into evidence as dying declarations.
 II "It is well settled that the admission in evidence of the dying declarations of the person murdered is not an infraction of the constitutional or statutory right of accused to be confronted by the witnesses against him." 40 C.J.S. Homicide § 287 (c) (1944).
This principle was recognized in Green v. State, 66 Ala. 40,47-8, 41 Am.Rep. 744 (1880).
 III
In a homicide prosecution, "threats or hostile demonstrations by the accused toward persons not connected with the deceased are not admissible." McGuff v. State, 49 Ala. App. 88, 91,268 So.2d 868, 871, cert. denied, 289 Ala. 746, 268 So.2d 877 (1972). This rule was not violated when the State elicited testimony that the defendant asked David Lawrence Bates, who was dating the defendant's ex-wife, to leave Mrs. Voudrie's home on an occasion three days before her murder. The record reveals no threat. Bates was connected with the deceased and the testimony of this event was properly admitted to show a possible motive by the defendant to kill his wife, i.e., jealousy. Gregg v. State, 106 Ala. 44,17 So. 321 (1895); Roberts v. State, 25 Ala. App. 477, 149 So. 356
(1933).
Any fact which tends to prove the real motive of the defendant for killing the deceased is relevant evidence. Garrett v. State,268 Ala. 299, 105 So.2d 541 (1958). The prosecution may properly show jealousy and unrequited love as motives for a homicide.Roberts v. State, 171 Ala. 12, 54 So. 993 (1911); Walker v.State, 85 Ala. 7, 4 So. 686 (1887); George v. State, 240 Ala. 632,200 So. 602 (1941); McMurphy v. State, 4 Ala. App. 20,58 So. 748 (1912).
 IV
The trial judge did not abuse his discretion by refusing to permit the jury to see the murder weapon test fired. This was a matter within his sound discretion. McElroy, § 81.01 and § 208.01. At trial it was undisputed that the pistol would fire as fast as one could pull the trigger and that it would fire rapidly. However, there was never any evidence at trial that the weapon had a hair trigger or that it was capable of firing as a fully automatic pistol.
At trial it was contended by the defense that "based upon experiments with the weapon, . . . an entire clip of seven bullets could be fired by even a novice in 1.5 or 1.6 seconds." (Appellant's brief, p. 30). Initially this matter was injected into the trial through a hypothetical question asked by defense counsel of Dr. Ronald Rivers, the chief coroner-medical examiner for Jefferson County.
 "Q. I will ask you whether also, hypothetically, if it were determined that the pistol which inflicted these wounds had a hair trigger and if it were, hypothetically, presented to you that even to a novice with guns, all seven shots could have been discharged in less than two seconds, say 1.5 seconds — is it possible that the deceased could have received all of these wounds within a very brief span of time — is that possible, say within several seconds, if she was moving and the shots were going off real quickly?
 "A. Yes, sir, it is possible that she could have received all of these shots within a short period of time."
On cross examination of Officer Slimp, defense counsel inquired:
 "Q. You are aware, are you not, through your investigation, et cetera, that I test fired it in the presence of certain Homewood officers about two weeks ago?
"A. No, sir, I am not aware of that."
On cross examination of Officer George R. Carr, III, defense counsel pursued this matter: *Page 253 
 "Q. The day we were all on — February 23rd, at the police academy, do you recall that I fired that pistol twice on the firing range — well, two successive times. In other words I emptied two clips in the pistol, do you recall that?
"A. That's correct."
* * * * * *
 "Q. Do you recall that the first time I fired the pistol, all seven shots were fired in approximately two seconds, bang, bang, bang, bang?
"A. As fast as you could pull the trigger."
* * * * * *
 "Q. Again, do you recall that all seven shots went in approximately one and one-half or two seconds?
"A. Yes, sir."
Officer Carr stated that he could not testify as to the "trigger pull" of the pistol as he had never fired the weapon.
On redirect examination, Criminalist Lauden Yates, Jr., testified that a "hair trigger" indicates a minimal trigger pull. He concluded: "I would consider that the trigger pull of this weapon would be within normal limits." On recross examination, defense counsel asked:
 "Q. Do you recall the first time that I fired that pistol that I discharged all seven shots in approximately two seconds?
 "A. I noted that the firing was rapid. I don't know how many seconds it took.
 "Q. And do you recall the second clip that I fired being approximately 1.5 or 1.6 seconds or slightly less than two?
"A. I didn't time it but I remember it being rapid."
After this testimony defense counsel requested that "we be permitted to fire this pistol in the presence of the jury at the firing range at the police academy." This request was denied and properly so. In order to determine whether the murder weapon had a "hair trigger" each juror would have had to personally fire the weapon. Allowing the jury to see the pistol fired would only demonstrate that the weapon could be fired rapidly — a point not disputed. Expert testimony may be used as evidence as to the manner or ease of firing a weapon. Annot. 63 A.L.R.2d 1150 (1959). It was not employed by the defense in this case.
At the hearing on the motion for new trial, defense counsel contended that the pistol "does not appear to be hair triggered unless it is loaded with a clip in it." At trial there was no evidence of this. However, at trial the defendant did testify that the pistol would not stop firing after he pulled the trigger with the safety on. He stated that the pistol "was just going off like a tommy gun." Defense counsel had himself placed under oath and testified that he test fired the murder weapon on February 23, 1978.
 "It was a full clip. I pulled the trigger once and the entire clip was emptied in approximately two seconds. Immediately after that, I commented my surprise and shock that a hand pistol could be fired so quickly . . . The second clip was completely emptied by me, firing, in approximately one and a half seconds. As quickly, just about as I can say now, bang, bang, bang, bang, bang, bang, bang, it was emptied. I only pulled the trigger once. I didn't have to calmly pull it each time. If I had, it obviously would have taken much longer. This was the basis of my Motion during the trial that the jury should have been permitted to see anyone fire the pistol with a full clip. . . . It's a very hair trigger type rapid firing pistol and it is obviously not hair trigger rapid firing when it is emptied."
* * * * * *
 "Obviously it is a hair trigger pistol from by observation, being a novice, having pulled the trigger one time and it discharging all bullets with one pull . . . Had the jury seen a demonstration, whether you, me, or Judge Jasper, anyone pulled that trigger, when its got a full clip, you pull that trigger, it goes like a machine gun. And, it may be a semiautomatic but because of whatever was wrong with it, it goes like an automatic." *Page 254 
This argument does not sustain the granting of a new trial because this evidence was available to the defendant and known by his attorney during his trial. Jarrell v. State, 355 So.2d 747
(Ala.Cr.App. 1978).
 V
The defense contends that the evidence of insanity is so strong that the evidence is insufficient to support the jury's verdict of conviction. We do not agree.
To date only five convictions have been reversed by the appellate courts of this state because the weight of the evidence on the question of insanity was so clear and strong that the statutory presumption of sanity was overcome. Christian v. State,351 So.2d 623 (Ala. 1977); Sasser v. State, Ala.Cr.App., 4 Div. 783, 387 So.2d 237 (Ms. April 22, 1980); Woods v. State,364 So.2d 1178 (Ala.Cr.App.), cert. denied, 364 So.2d 1186 (Ala. 1978); Herbert v. State, 357 So.2d 683 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala. 1978); and Pickett v. State,37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699,71 So.2d 107 (1954). None of these cases has been cited by the defendant on appeal. In this case, although the evidence would authorize the jury to find the defendant not guilty by reason of insanity, it does not compel such a finding.
Dr. Emil Spillman, M.D., is a hypnoanalyst from Atlanta, Georgia. In his opinion the shooting was accidental and the defendant "didn't even know he was firing the shots." Dr. Spillman placed the defendant in a hypnotic trance and then used a special technique known as age regression in which the subject actually relives a previous event or experience in his life. According to Dr. Spillman, the defendant, under hypnosis, recalled and relived the shooting. Dr. Spillman testified:
 "His wife mentioned to him the fact that there was a gun which apparently he had bought for her; that she had put it in his car. That he became extremely agitated about this, screaming something to the effect that, don't you know that if I get drunk and they catch me, I will go to jail. He went out to his car. He got the gun, he came in, was showing her the gun. At this time actually going through the motions in front of him as if he was handling the gun, was explaining to her how to unload the gun and load the gun and pointed his arm out to the side, showing her that the safety was on and suddenly the gun went off. And as the gun went off, he began to scream, the gun is going off, the gun is going off, and apparently at this time, became completely hysterical, not realizing he was firing the gun and as the gun came up into the air, he swung it through the air just like he had that night with the gun firing all the time. He was shouting and being completely in a highly hysterical state."
Dr. Spillman testified that at the time the shots were being fired, the defendant was "dissociative" and "really didn't even realize where he was." Dr. Spillman stated that the defendant did not intentionally shoot his wife and thought that the first shot was fired accidentally: "I think he was trying to show her that the safety was on, but we couldn't elicit that."
Dr. Spillman's testimony was based upon the facts supplied by the defendant-that the shooting was accidental. He was never questioned about the dying declarations of the deceased and the alleged fact that the defendant said he was going to shoot his wife before he ever pulled the trigger.
The other expert called by the defense was a psychologist, Robin D. King. He stated that, in his opinion, the defendant was suffering from a mental illness which would have severely impaired his judgment. However, King's testimony was inconclusive. He could only say that there was a "strong likelihood" that the defendant lost control at the time of the shooting.
 "I have no data that would really answer the question of accident or non-accident. My data does suggest, however, that there was a strong likelihood that however the accident started or the episode started, that it is possible, and perhaps even probable, that Michael Voudrie was not in control of those actions as the result of being in a dissociative state." *Page 255 
Dr. King's testimony, although indicative, was not conclusive of the defendant's legal insanity. Meredith v. State, 370 So.2d 1075
(Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala. 1979).
While the jury could have found the defendant not guilty by reason of insanity, this conclusion is not compelled in this particular case. The jury did not have to arbitrarily ignore expert testimony in order to convict the defendant. The jury had a clear although difficult choice. The State presented a case of intentional murder by a jealous and intoxicated defendant who had been rejected by his ex-wife. The defense presented a case of an accidental shooting by a defendant in a "dissociative hysterical state" who did not even know what he was doing. Under the facts of this case, the issue of the defendant's mental condition was for the jury and no other.
 VI
The defendant contends that the jury was improperly allowed to view a jacket worn by the deceased at the time of her death. The jacket had bullet holes it it and bloodstains on it.
On three separate occasions the State attempted to introduce this jacket into evidence. On each occasion the trial judge sustained the general objection of defense counsel without giving any reason for his action. At the hearing on the motion for new trial, the trial judge stated that reason.
 "The exhibiting of the jacket, the Court does not feel there is any prejudicial matters presented to the jury that tried this matter as to the jacket. And, the Court subsequently, sustained counsel's objection to the admissibility of the jacket on the failure of the State to show a chain of evidence on the jacket."
The rule is stated in Flannagin v. State, 289 Ala. 177, 180,266 So.2d 643, 646 (1972).
 "It is a long established rule of this State that demonstrative evidence, such as clothing worn by deceased at the time of the killing, is admissible if it tends to shed light on any material inquiry, even though such evidence is only cumulative of other evidence and tends to inflame the jury."
Criminalist Yates testified as to his examination of the jacket and the results of his findings including the location of the bullet holes and bloodstains. There was never any objection or even suggestion that the jacket was tampered with. Under these circumstances we fail to see any prejudice to the defendant. Alabama Rules of Appellate Procedure, Rule 45.
 VII
The photographs of the body of the deceased were admissible even though the photographs contained marks of the surgery performed on the deceased when she was taken to the hospital following the shooting.
 "The general rule in Alabama is that photographs of a murder victim taken after the performance of surgery or an autopsy are admissible in evidence even though they show the marks of incisions made for the purpose of the autopsy or resulting from the surgery where these marks are sufficiently identified and pointed out to the jury." Gilmore v. State, 346 So.2d 1193, 1196 (Ala.Cr.App. 1977).
This rule was not violated in this case.
 VIII
The defendant contends that, once the trial court permitted Dr. Spillman to testify in detail concerning a mental examination he conducted on the defendant, the tape recording of the actual interview was admissible upon proper request. The defendant's proposition is almost correct.
Generally, sound recordings are admissible as corroborative of oral testimony. Annot., 58 A.L.R.2d 1024, § 12 (1958). As was stated in Wright v. State,, 38 Ala. App. 64, 72, 79 So.2d 66, 73, cert. denied, 262 Ala. 420, 79 So.2d 74 (1954):
 "If the parties who were present when the recording was made are available and testify as to the statements made, the recording, even though inaudible, in *Page 256 
parts, should be admitted as corroborative of the testimony of the witness or witnesses testifying to the statement."
However, sound recordings are admissible providing a proper foundation is laid for their admission. The rules for testing the admissibility of recordings have been outlined as follows:
 "(1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement." 58 A.L.R.2d at 1027-8.
Thus not only is a proper request necessary but a proper predicate is necessary before a sound recording can be admitted into evidence. At the hearing on the motion for new trial it was established that Dr. Spillman had never listened to the particular tape that was offered into evidence. It was also shown that Dr. Spillman asked the trial judge not to allow the tape into evidence. Since defense counsel did not attempt to present a proper predicate, the trial judge was correct in not allowing the jury to hear the tape.
We have searched the record for error prejudicial to the defendant and have found none. The judgment of the trial court is affirmed.
AFFIRMED.
All Judges concur.
[1] The shooting occurred in Mrs. Voudrie's home. The shots awoke the defendant's two sons. The boys came out of their bedrooms and the defendant assured them separately that "it's going to be all right" and placed them back in bed. The defendant testified that he did this as quickly as he could and took the "quickest route" to the telephone.