Rel: December 15, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

-----------------------------

### CR-21-0410

-----------------------------

**Lavacus Derrell Hooks**

**v.**

**State of Alabama**

**Appeal from Montgomery Circuit Court**
**(CC-19-1351)**

COLE, Judge.

Lavacus Derrell Hooks appeals his conviction for second-degree assault, a violation of § 13A-6-21(a)(2), Ala. Code 1975,[1] and his resulting

---

[1]Hooks was indicted for attempted murder, a violation of §§ 13A-4-2 and 13A-6-2, Ala. Code 1975, but he was convicted of the lesser-included offense of second-degree assault.

sentence of 20 years' imprisonment, which was split to serve 5 years' imprisonment followed by 2 years' probation.

Facts and Procedural History

Hooks and David Jerome Lee were incarcerated in the same "lockdown" wing of the Montgomery County Detention Center. That wing remains locked down with a "23-1" rotation, meaning that inmates are allowed out one at a time for one hour, but otherwise they are secured in a cell. (R. 104.) The cell doors are secured electronically, but there is a history of inmates "jamming" the door locks to prevent them from being secure without alerting detention-center staff. (R. 103-04, 109.)

On August 7, 2019, Lee was on his way to take a shower when Hooks exited his cell and used an unknown object to stab Lee multiple times. Hooks then "skipped" back to his cell. Lee was taken to the hospital to be examined. Lee had multiple lacerations on his left arm and shoulder, a minor puncture wound on the back of his head, and four puncture wounds on his back with lacerations. He had been stabbed approximately eight times. (R. 125-26.)

At trial, the State presented two witnesses, Lieutenant Oscar Richardson of the Montgomery County Detention Center and

2

Investigator M.B. Morrow of the Montgomery County Sheriff's Office. The State presented a jail-surveillance video, which was labeled State's Exhibit 1, photographs of Lee's injuries, and photographs of the cell area after the incident. State's Exhibit 1 was played during the testimony of Lt. Richardson and Inv. Morrow and during the State's closing arguments. Hooks objected to the introduction of State's Exhibit 1 on the ground that the State had failed to lay the proper foundation under the "silent witness" theory.

On February 15, 2022, the jury found Hooks guilty of second-degree assault. (C. 135.) The Montgomery Circuit Court sentenced Hooks immediately after the jury returned its verdict. After argument from counsel, the trial court imposed two different sentences, but after Hooks's counsel objected to both sentences, the trial court imposed a sentence of 15 years and 1 day in prison, which was split to serve 3 years in prison followed by 2 years of probation. (R. 205-08.) The following day, the trial court returned Hooks to the courtroom and resentenced him, over defense counsel's objection, to 20 years in prison, which was split to serve 5 years in prison followed by 2 years of probation.

Discussion

Hooks raises four issues on appeal: (1) that the trial court erred when it admitted the jail-surveillance video without requiring the State to lay the proper predicate for the admission of the video, (2) that the trial court erred in instructing the jury on the issue of "flight," (3) that the trial court erred in refusing to instruct the jury on the lesser-included offense of third-degree assault, and (4) that the trial court violated double-jeopardy principles by increasing Hooks's sentence after imposing a legal sentence the preceding day.

I.

As set out above, the State introduced a jail-surveillance video of Hooks stabbing Lee -- State's Exhibit 1 -- during the testimony of Lt. Richardson. Hooks objected to the admission of the video because, he said, the State did not lay the proper foundation to authenticate the video under the silent witness theory. The trial court overruled Hooks's objection and admitted the video, and the video was played for the jury. (R. 99.) Except for the video, there was no other direct evidence that Hooks committed the offense in question. As he asserted at trial, Hooks argues on appeal that the trial court erred in admitting the video into

4

evidence because the State failed to establish a proper foundation for the admission of the video.

As both parties acknowledge in their briefs on appeal, there are two primary theories for the admission of video evidence. In Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993), the Alabama Supreme Court held:

> "There are two theories upon which photographs, motion pictures, videotapes, sound recordings, and the like are analyzed for admission into evidence: the 'pictorial communication' or 'pictorial testimony' theory and the 'silent witness' theory. [James H. Chadbourn,] Wigmore [on Evidence], § 790 [(1970 & Supp. 1991)]; [2 John W. Strong,] McCormick [on Evidence] § 214 [(1992)]; 6 William A. Schroeder [et al.], Alabama Evidence, [§ 11-3 (1987 & Supp. 1988)]. The 'pictorial communication' theory is that a photograph, etc., is merely a graphic portrayal or static expression of what a qualified and competent witness sensed at the time in question. Wigmore, supra, § 790, and McCormick, supra, § 214. The 'silent witness' theory is that a photograph, etc., is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the photograph, etc., is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness's senses, and because the process or mechanism is explained before the photograph, etc., is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the photograph, etc., records. Wigmore, supra, § 790, and McCormick, supra, § 214.

> ".... The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If

there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the 'silent witness' foundation must be laid. Under the 'silent witness' theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the 'silent witness' theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong <u>Voudrie [ v. State</u>, 387 So. 2d 248 (Ala. Crim. App. 1980),] test. Rewritten to have more general application, the <u>Voudrie</u> standard requires:

"(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,

"(2) a showing that the operator of the device or process or mechanism was competent,

"(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,

"(4) a showing that no changes, additions, or deletions have been made,

"(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,

"(6) identification of the speakers, or persons pictured, and

"(7) for criminal cases only, a showing that any statement made in the recording, tape, etc.,

6

was voluntarily made without any kind of coercion or improper inducement.

"On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the 'pictorial communication' theory. Under this theory, the party offering the item must present sufficient evidence to meet the 'reliable representation' standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds."

At trial, the State did not present any witnesses who could testify that the video reliably and accurately reflected what they sensed at the time of the incident. Therefore, the State was required to lay a predicate under the "silent witness" theory to admit State's Exhibit 1 into evidence.

The State called only two witnesses during Hooks's trial. Lt. Richardson -- a shift commander at the detention center -- was the primary witness called by the State to lay a predicate for the video. Lt. Richardson testified that he is familiar with the surveillance system that is installed in the detention center and that he has been trained in how to search for incidents in the system's hard drive. (R. 96-97.) Lt. Richardson testified that the system is "designed to aid us in monitoring the inmate population because it's humanly impossible to see everything

7

-- everyone and everything." (R. 96.) He described the training he had received on the system as "pretty basic and routine." (R. 96.) He further detailed the training as follows:

> "The basic training is you utilize the monitors to, like I said, aid in monitoring the inmates, things of that nature. The system records 24/7. There is a database that is primarily utilized by supervisors that we go back -- log into to research incidents; or if we have an issue in a cell block, to try to narrow down, you know, to find out what really happened, yeah."

(R. 96-97.)

Lt. Richardson further testified that surveillance footage is kept on a hard drive and could be transferred to a USB drive. He said that the system constantly records and "never" records over footage. (R. 97.) Lt. Richardson stated that he watched the video related to the incident involving Hooks and Lee "when the incident first occurred" and reviewed it again the day of trial. (R. 97-98.) He identified State's Exhibit 1 as "the disk that I viewed, and I also initialed it." (R. 98.) He testified that when he reviewed the footage it was in the same or substantially the same condition as the last time he had reviewed it and that it had not been altered in any way. (R. 98.) Lt. Richardson testified that the video accurately and fairly depicted the J1, 4B cell block at the Montgomery County Detention Center. (R. 108, 111.)

8

However, on cross-examination, after the video had been admitted into evidence and published to the jury, Lt. Richardson testified that he did not know how the system was installed or how it is maintained. He responded to questions regarding installation and maintenance by stating that "IT" would need to be consulted for that information. Lt. Richardson said that he did not know what kind of safeguards or security measures exist in the system's software and that all supervisors have access to the system. He also could not testify as to how the system itself is kept secure in the detention center. Also, Lt. Richardson stated that he was not working the night of the incident, did not watch the video footage of the incident until the next day, and was not the person who downloaded the video from the system to the disk. (R. 105-06.) But, he said, the video was "burned directly from the software directly to the disk." (R. 108.) He again testified on redirect examination that the video fairly and accurately depicts the J1, 4B cell block at the Montgomery County Detention Center. (R. 111-12.)

Hooks argues that the video was not properly authenticated under the silent-witness theory. Hooks does not contend that the surveillance system was incapable of recording the event in question, that the

9

operator of the system was not competent, that the identity of the individuals pictured was not established, or that there was any type of coercion in creating the video. Hooks, instead, argues that the State failed to establish the "authenticity and correctness" of the recording, that the State failed to show that no "changes, additions, or deletions have been made," and that there was an insufficient showing of how the recording was preserved. Hooks focuses on the State's failure to mention any specific "safeguards" in the system to prevent alterations and the fact that Lt. Richardson did not view the video until the day after the incident. Hooks's argument, which depends on a rigid reading of the requirements set forth in Voudrie v. State, 387 So. 2d 248 (Ala. Crim. App. 1980), is without merit.

We first note that "[t]he question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). Regarding the fourth Voudrie requirement -- that no alterations have been made -- this Court explained in Capote v. State, 323 So. 3d 104, 133 (Ala. Crim. App. 2020), that the Voudrie

10

requirements, particularly this one, should not be applied "too strict[ly]." Id. "[T]he clear import of the prong is that the video in question accurately reflects what it is purported to show." Id. The State made this showing.

Lt. Richardson testified that the video "fairly and accurately" represented the jail cell block, that the surveillance system records continuously, and that the system "never" records over data. Lt. Richardson further testified that he and other supervisors routinely log in to the system and view videos to research incidents on the cell block. Lt. Richardson viewed the video of Hooks stabbing Lee the day after the assault. The video that he watched the day after the assault was downloaded from the system's hard drive directly onto the disk that Lt. Richardson initialed. Moreover, Lt. Richardson testified that the video played at trial was the same as the video he watched the day after the incident.

Additionally, it is important to note that "[t]here is no evidence indicating that the recording was altered so as to give a misleading account of the [stabbing] or that the video footage was anything other than what it purported to show." Capote, 323 So. 3d at 134. Indeed,

Hooks has never alleged that the video has been altered. Moreover, that a video is accurate and trustworthy and that no alterations have been made may be shown in multiple ways. For example, in Capote, this Court found that Voudrie's requirements had been satisfied because the operator of the equipment testified that "she did not 'see how [the officers] could [edit the video]' because the video is 'time and date stamped.'" Id. at 133 (quoting R. 509-10). Although no witness so testified in Hooks's trial, the video, which this Court has viewed, speaks for itself. As in Capote, the video is date- and time-stamped, and there was no challenge below to the accuracy of those stamps. Furthermore, the time is provided by a clock that is accurate to the nearest thousandth of a second. The entire video lasts less than a minute and continuously shows Hooks's attack on Lee from start to finish. On August 7, 2019, Lee gets to the top of the stairs at 7:38:35.448 p.m. Hooks is clearly seen running out of his cell after Lee at 7:38:40.254 p.m. At 7:38:43.925 p.m., Hooks starts stabbing Lee, then he drops onto the ground a bedsheet that was used as a "handle" for the weapon used in the stabbing. Hooks then skips back to his cell at 7:39:01.801 p.m. Hooks arrives back at his cell and closes the door at 7:39:09.023 p.m. There are no breaks or pauses in the video

that would indicate any alteration, addition, or deletion of any kind. The accuracy of the video is corroborated by the testimony of Inv. Morrow who authenticated photographs, taken less than an hour after the stabbing, of blood stains in the area where the stabbing occurred and of the "sheet" found in the area where it was shown to be discarded in the video. (R. 118-19, 124, 133.) Furthermore, the video depicts Hooks exiting and returning to the jail cell that Inv. Morrow confirmed was Hooks's own "lock-down" "isolation area" jail cell, and there was no dispute that Hooks was found in the cell after the assault. (R. 101-02, 176.) In sum, the reliability and trustworthiness of the surveillance system was explained by Lt. Richardson, and his testimony, in combination with the trial court's and this Court's viewing of the video, shows no evidence of alteration of the continuous, date- and time-stamped surveillance-video recording.

Finally, "[b]ecause the videotape was properly authenticated … and because the State established that the video[-recording device] was a reliable mechanism that was capable of accurately recording the [stabbing], the State was not required to establish a chain of custody for

the videotape." Woodward v. State, 123 So. 3d 989, 1027 (Ala. Crim. App. 2011).

Accordingly, the trial court did not abuse its discretion by admitting the jail-surveillance video.

## II.

Hooks next argues that the trial court erred in instructing the jury on the issue of "flight." On appeal, Hooks raises two grounds for this Court's consideration: (1) that the instruction was improper because it "informed the jury that flight should be considered as a consciousness of guilt rather than allowing the jury to weigh the reason for the supposed flight" (Hooks's brief, pp. 31-32) and (2) that the evidence did not support a flight instruction.

The first argument regarding the content of the trial court's flight instruction was not properly preserved for appellate review. The trial court instructed the jury as follows: "If you find from the evidence that the defendant fled from the scene of the crime, then you may consider that evidence as tending to show the defendant's consciousness of guilty." (R. 189.) Hooks compares this instruction to the one given in Ex parte Weaver, 678 So. 2d 284, 287 (Ala. 1996), in which Weaver's conviction

14

was reversed because the instruction "improperly suggested to the jury that the only conclusion that could be reasonably drawn from the evidence was that Weaver had gone to Florida to avoid prosecution."  At trial, Hooks objected to the State's proposed flight instruction and asserted that the instruction was not justified because Hooks was merely "leaving the assault as opposed to trying to escape the jail or trying to run from apprehension" and that he left to a location where authorities "can find him."  In other words, although Hooks objected to the applicability of a flight instruction, he did not object based upon the content of the specific flight instruction given in this case.

It is well settled that

"'[r]eview on appeal is restricted to questions and issues properly and timely raised at trial.' Newsome v. State, 570 So. 2d 703, 717 (Ala. Crim. App. 1989).  'An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.' Pate v. State, 601 So. 2d 210, 213 (Ala. Crim. App. 1992). '"[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof."' McKinney v. State, 654 So. 2d 95, 99 (Ala. Crim App. 1995) (citation omitted).  'The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.' Ex parte Frith, 526 So. 2d 880, 882 (Ala. 1987).  'The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error,

15

giving an opportunity to correct it before the case is submitted to the jury.' Ex parte Works, 640 So. 2d 1056, 1058 (Ala. 1994."

Ex parte Coulliette, 857 So. 2d 793, 794-95 (Ala. 2003). "'In order to preserve for review an objection to the giving or the denial of a jury instruction, it is necessary for the appellant to state for the record upon what specific grounds the objection is made.' Cauley v. State, 681 So. 2d 1105, 1107 (Ala. Crim. App. 1996)." Buford v. State, 891 So. 2d 423, 431 (Ala. Crim. App. 2004).

Because Hooks did not object to the content of the trial court's flight instruction that he now challenges on appeal, this issue is not properly before this Court. Therefore, Hooks is not entitled to relief on the first ground he raised regarding the content of the trial court's flight instruction.

Hooks also argues on appeal that there was no evidence to support the trial court's instruction on flight. Specifically, Hooks asserts that his "exiting and returning to his cell could not have been to avoid apprehension or prosecution"; therefore, he asserts, his actions after the assault could not be regarded as "flight." Although this issue was

16

preserved for appellate review, Hooks is not entitled to relief on this claim.

This Court has consistently held that "'[a] trial court has broad discretion when formulating its jury instructions.'" Belcher v. State, 341 So. 3d 237, 289 (Ala. Crim. App. 2020) (quoting Williams v. State, 795 So. 2d 753, 780 (Ala. Crim. App. 1999)). As both parties acknowledge, "'Alabama caselaw has long held that evidence of flight or attempted flight in a criminal case is a circumstance that a jury may take into consideration in determining guilt or innocence.'" Young v. State, [Ms. CR-17-0595, Aug. 6, 2021] ___ So. 3d ___, ___ (Ala. Crim. App. 2021) (quoting Henderson v. State, 248 So. 3d 992, 1011 (Ala. Crim. App. 2017)).

Although Hooks did not leave the detention center where he was incarcerated, he did leave the "scene" of the stabbing. As previously noted, a video of the incident showed that Hooks left his cell, stabbed Lee numerous times from behind, and went immediately back to his cell and closed the door. The jury could have concluded that Hooks left the common area where the stabbing occurred and returned to his cell to cover up his involvement in the stabbing and to avoid apprehension for

his acts. Although Hooks correctly asserts that his whereabouts would have been known because he returned to his own cell, his decision to return to his cell could have certainly been regarded as an attempt to act as if he had never left his cell and, thus, be regarded as an attempt to avoid apprehension and prosecution. The jury could have concluded that Hooks exhibited a consciousness of guilt when he fled, albeit by skipping away, from the area where Lee was assaulted; therefore, the trial court did not err in instructing the jury that it could consider Hooks's actions in determining whether the State had proven its case beyond a reasonable doubt. Accordingly, the trial court did not err in giving a flight instruction.

III.

Third, Hooks argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of third-degree assault. The State argues that this issue was not properly preserved for appellate review and that, regardless, the evidence did not warrant an instruction on third-degree assault. We agree that this issue was not preserved for appellate review and that the argument is without merit.

The indictment returned by the Montgomery County Grand Jury charged Hooks with the attempted murder of Lee. After both sides presented evidence and rested, the trial court held a charge conference. The trial court denied the State's request for a jury charge on first-degree assault. Hooks did not object to the State's request for a jury instruction on the lesser-included offense of second-degree assault. Hooks's attorney then orally requested, as follows, that the jury be instructed on third-degree assault:

> "[Hooks's attorney]: I would ask -- request that the Court also instruct on assault third. Assault third requires physical injury. And the only difference between assault second and assault third is the lack of a dangerous instrument or deadly weapon.

> "In this case, Your Honor, although there is evidence to suggest that one was used, the jury could believe that an object that would not constitute a deadly weapon, but would -- For example, if the jury believed that something like a pencil was used, some sharp object that wasn't typically used for the purpose of causing injury, if they believe that -- Under the circumstances of this case, a dangerous instrument would be defined as something -- sorry -- which under the circumstances in which it is used or threatened to be used is highly capable of causing death or serious physical injury. Because there is no evidence of substantial risk of death or serious physical injury in this case, the jury could believe that whatever was used was not -- did not constitute a dangerous instrument. And, therefore, we think, whether it's a strong argument or not, it's sufficient to go to the jury."

19

(R. 150-51.) After the State gave reasons why it believed that an instruction on third-degree assault was inappropriate, the following transpired:

> "THE COURT: [Prosecutor], does a pencil qualify as a dangerous instrument?
>
> "[Prosecutor]: It can qualify as a sharp object.
>
> "[Hooks's attorney]: It can depending on the circumstances in which it's used, Your Honor. The case law on that is specific to if you jammed it into someone's eye or some other area that would have a substantial risk of death or serious physical injury.
>
> "Our argument that if that is what's used in this case, it did not create substantial risk of death or serious physical injury and, therefore, it could be considered not a dangerous instrument under the specific facts and circumstances.
>
> "THE COURT: All right. Here's what I think we're going do to [sic]. We're going to charge on attempted murder and assault second.
>
> "[Hooks's attorney]: Yes, Judge."

(R. 153.)

After hearing from both sides, the trial court determined that a jury charge on the lesser-included offense of second-degree assault would be given but that a charge on third-degree assault would not be given. Hooks's attorney did not object to that decision. The attorneys and the

20

trial court continued to discuss potential jury charges before the attorneys were allowed to give closing arguments, but Hooks did not object to the trial court's failure to instruct the jury on third-degree assault. Furthermore, after closing arguments, the trial court met with the parties outside the presence of the jury, reviewed several of the State's proposed written jury charges, and reiterated that it would "read the code section on attempted murder and on assault second," but defense counsel did not make an objection. (R. 173-74.) During that discussion, Hooks's attorney made very specific objections to other requested charges by stating things such as "[t]here is an objection to number eight" while giving detailed reasons for the objection, and when the trial court stated that "charge number eight will be given," defense counsel further explained their objections. When the trial court again said charge number eight would be given, Hooks's attorney stated:

> "[Hooks's attorney]: Just because I'm paranoid, Judge, is that a ruling that my objection is overruled?
>
> "THE COURT: Yes. I'm sorry. Your objection is overruled, for the record. So eight will be given."

(R. 178.) Although Hooks requested a charge on third-degree assault and provided grounds regarding why the trial court should give a charge on

third-degree assault, no objection was made to the trial court's decision to charge the jury only on attempted murder and second-degree assault.

The law is clear that "'"'[a] person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses.' MacEwan v. State, 701 So. 2d 66, 69 (Ala. Crim. App. 1997)."'" Williams v. State, 351 So. 3d 559, 563 (Ala. Crim. App. 2021) (quoting Harbin v. State, 14 So. 3d 898, 909 (Ala. Crim. App. 2008), quoting in turn Clark v. State, 896 So. 2d 584, 641 (Ala. Crim. App. 2000) (opinion on return to remand)). Although individuals have the right to have the jury charged on lesser-included offenses that are supported by the evidence, to raise that issue on appeal they must properly preserve the trial court's failure to give such an instruction. "It is well settled that '"[r]eview on appeal is restricted to questions and issues properly and timely raised at trial."' Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003) (quoting Newsome v. State, 570 So. 2d 703, 717 (Ala. Crim. App. 1989))." Fitzgerald v. State, 334 So. 3d 257, 261 (Ala. Crim. App. 2020). Furthermore, "'"it is incumbent upon counsel to obtain an adverse ruling to preserve an issue for appellate review."'" Knight v. State, 300 So. 3d

76, 92 (Ala. Crim. App. 2018) (quoting Lucas v. State, 204 So. 3d 929, 939

(Ala. Crim. App. 2016), quoting in turn Pettibone v. State, 91 So. 3d 94,

114 (Ala. Crim. App. 2011)).  Rule 21.3, Ala. R. Crim. P., also states, in

part, that

> "[n]o party may assign as error the court's giving or failing to
> give a written instruction, or the giving of an erroneous,
> misleading, incomplete, or otherwise improper oral charge,
> unless the party objects thereto before the jury retires to
> consider the verdict, stating the matter to which he or she
> objects and the grounds of the objection."

The record reflects that Hooks did not submit written requested jury

charges.  Yet,

> "[w]hile the proper procedure for requesting a jury charge is
> to file a written request with the trial court, [the Alabama
> Supreme Court] has held an oral request for a jury charge to
> be sufficient, provided, if the trial court does not give the
> charge, that the defendant objects to the refusal and the court
> is aware of the objection and the reason counsel is requesting
> the instruction.  Ex parte McCall, 594 So. 2d 628 (Ala. 1991)."

Ex parte Weaver, 763 So. 2d 982, 985 (Ala. 1999).

In this case, Hooks neither objected nor obtained an adverse ruling

from the trial court.  As noted above, after Hooks's attorney argued that

a jury instruction on third-degree assault should be given, the trial court

responded: "All right."  This is similar to Davenport v. State, 653 So. 2d

1006 (Ala. Crim. App. 1994), in which Davenport requested a jury

23

instruction on intoxication and its effect on the issue of intent. In response to Davenport's request, the trial court responded, "Thank you," but did not give the requested instruction. This Court held that " 'Thank you,' does not constitute an adverse ruling, which is necessary for preservation of the alleged error." Id. at 1008 (citing Seay v. State, 479 So. 2d 1338, 1342 (Ala. Crim. App. 1985)). Likewise, the trial court's response of "All right" was not an adverse ruling. It also appears that Hooks acquiesced in the trial court's decision by responding, "Yes, judge," without objecting at that time or during future occasions when he was given an opportunity to make an objection.

Even if this issue had been properly preserved for appellate review, Hooks would not be entitled to relief based upon to the trial court's failure to instruct the jury on third-degree assault. As Hooks stated to the trial court, the difference between the instruction that the trial court gave on second-degree assault and an instruction on third-degree assault is that third-degree assault does not involve the use of a "deadly weapon or a dangerous instrument." §§ 13A-6-21 and 13A-6-22, Ala. Code 1975. A "dangerous instrument" is defined as "[a]ny instrument, article, or substance which, under the circumstances in which it is used, attempted

to be used, or threatened to be used, is highly capable of causing death or serious physical injury." § 13A-1-2(5), Ala. Code 1975. In this case, Lee was stabbed and cut with an unknown object. There was testimony that he suffered multiple lacerations and puncture wounds to the head and the body. (R. 125.) This included a "very deep" puncture wound that was close to Lee's neck and spine. (R. 127.) There was evidence of blood on the floor and wall where Lee was stabbed and additional blood on the bed where he was treated. The jury also considered multiple photographs of the injuries suffered by Lee. (C. 151-160.) Based upon the nature of the injuries, it is clear that the unknown object that was used by Hooks was capable of causing serious physical injury. Therefore, Hooks was not entitled to a jury instruction on the lesser-include offense of third-degree assault.

## IV.

Hooks also asserts that the trial court erred in resentencing him to a more severe sentence than the sentence imposed on the day that he was convicted. As previously noted, the trial court sentenced Hooks immediately after he was adjudged guilty of second-degree assault. Both parties agreed to waive the preparation of a presentence-investigation

25

report. (R. 200.) Before trial, the State had filed a notice of intent to apply the Habitual Felony Offender Act ("HFOA"). This provided notice to Hooks and to the trial court that Hooks had two prior felony convictions, including one for first-degree assault and one for first-degree theft of property. (C. 115-18.) After finding that the range of punishment under the HFOA was imprisonment for 10-99 years or life, and hearing from the parties regarding the punishment to be imposed (R. 202-04), the trial court initially imposed a straight 132-month sentence of imprisonment, but Hooks's attorney objected on the ground that a 132-month sentence would have to be split pursuant to the "Split Sentencing Act," and the State agreed with that conclusion. (R. 205.)

The trial court then amended the sentence to 143 months of imprisonment, split with 36 months to serve in prison, followed by 2 years of probation. However, Hooks again objected and asserted that 2 years in prison was the maximum split that could be imposed for that sentence. (R. 206.) After discussions indicating that a sentence of 15 years or less in prison could be split to a maximum of 2 years to serve in prison, the trial court indicated that a 2-year split was insufficient. (R. 206.) The trial court then imposed a sentence of 15 years and 1 day, but that

26

sentence was split with 3 years to serve in prison followed by 2 years of probation. Hooks was then returned to the jail. (R. 207.)

The following day, Hooks was returned to court and appeared with his attorney. The trial court informed Hooks that part of the reason it had "rushed" Hooks's sentencing was to "alleviate the burden on the jail … so that [Hooks] could then begin serving [his] sentence." (R. 208-09.) The trial court further explained that, before the initial sentencing hearing, it had not had an "opportunity to look into [Hooks's] prior charge" and that, although Hooks had correctly told the trial court that his prior offense was an assault with a 10-year sentence, the trial court had decided to increase the sentence it had imposed the day before based upon its subsequent review of Hooks's prior assault charge.

Hooks's trial counsel objected, stating, in part, that she did "object to Mr. Hooks being re-sentenced with a more severe sentence in this case. Because the law on this issue is clear and unequivocal that, under the constitution of the United States and the constitution and law of Alabama -- that it violates Mr. Hooks' right to be free of double jeopardy." (R. 211.) Hooks's counsel pointed out that a valid and legal sentence had been imposed the preceding day, that Hooks had been honest about his

prior conviction and sentence, and that "there was no fraud perpetrated against the Court in getting that sentence [of 15 years and 1 day split to serve 3 years]." (R. 212.) The trial court agreed that "Hooks did not attempt any fraud on the Court" but indicated that the court's inability to "locate the prior charge at the time" was a "compelling reason" to amend the sentence. (R. 213.) The trial court also indicated that, "[w]hile the sentence was placed on the record yesterday, there's been nothing transmitted to the clerk" and that Hooks had not been on bond so he merely remained in custody and "continue[d] to accumulate jail credit toward his sentence." (R. 213.) After stating that "Hooks ha[d] not begun, in [the trial court's] mind, serving his sentence," the trial court imposed a 20-year sentence, but it split that sentence with 5 years to serve in prison followed by 2 years of probation. (R. 214-17.)

As he argued at the sentencing hearing, Hooks argues on appeal that the trial court violated his right not to be placed in jeopardy twice by imposing a legal sentence and then increasing that sentence the following day. We agree with Hooks.

The Alabama Supreme Court has held that "[o]nce a valid sentence has been entered, it cannot, in the absence of fraud or another compelling

reason, be altered anytime thereafter so as to increase the severity of the sentence." Ex parte Tice, 475 So. 2d 590, 591 (Ala. 1994) (citing Brown v. State, 376 So. 2d 1382 (Ala. Crim. App. 1979)). Both parties agree that the third sentence imposed by the trial court at the original sentencing hearing -- the sentence of 15 years and 1 day, which was split with 3 years to serve -- was a valid sentence and that Hooks did not commit any type of fraud to induce that sentence. Hooks cites Snell v. State, 723 So. 2d 105 (Ala. Crim. App. 1998), in support of his argument that the trial court erred in increasing his sentence.

In Snell, the trial court imposed a "valid sentence," but when Snell "directed obscene remarks towards the trial court shortly after sentencing … [the trial court] set aside the original sentence and resentenced" Snell to a more severe sentence. This Court did not specify the time that had passed between the imposition of Snell's original sentence and the imposition of the second sentence, but the opinion did state that it was "shortly after" the initial sentencing hearing and that Snell "was in the custody of the sheriff and had begun to serve his original sentence when the second and more severe sentence was imposed." Id. at 108. In addressing the trial court's assertion in Snell that it had a

"compelling reason" under <u>Tice</u> to resentence Snell, this Court held that it was "unnecessary to address that question because the resentencing was unauthorized and violated [Snell's] constitutional guarantee against double jeopardy." <u>Id.</u>

Furthermore, in addressing Hooks's assertion that there was not a "compelling reason" for the trial court to amend his sentence, the State appears to agree that, based upon this Court's holding in <u>Brown v. State</u>, 376 So. 2d 1382 (Ala. Crim. App. 1979), there was not a sufficient "compelling reason" to change Hooks's sentence. Like what occurred in this case, in <u>Brown</u> the trial court increased Brown's sentence after "additional information came to [the trial court's] attention which [he] did not know about concerning [Brown's] previous record." <u>Id.</u> at 1384. This Court held in <u>Brown</u> that a legal sentence "cannot, in the absence of fraud or another reason more compelling than the one presented by the circumstances in the instant case, be so changed at any time thereafter as to increase the severity of the sentence." <u>Id.</u> at 1391. As in <u>Brown</u>, the trial court's discovery of more detailed information about Hooks's prior conviction was not a "compelling reason" to increase Hooks's sentence.

The State appears to question whether the original sentence had been "entered" as required by Tice. The State also cites Ex parte Yeung, 489 So. 2d 1106 (Ala. 1986), in support of its argument that "any error in the trial court's actions was harmless." As Hooks points out in his reply brief, Yeung is clearly distinguishable from this case. First, the Court in Yeung held that Yeung's argument that the trial court had improperly set aside his 15-year sentences and imposed 20-year sentences was not properly preserved for review. Unlike in Yeung, Hooks clearly objected and preserved this issue for appellate review. Furthermore, the Court in Yeung noted that the record in that case showed "that immediately after the trial judge pronounced the first sentence, the prosecutor pointed out to him that § 13A-5-6(a)(4)[, Ala. Code 1975,] required that Yeung be sentenced to at least 20 years on each [first-degree robbery] count." Id. (emphasis added). Thus, the trial court in Yeung amended the sentence because the original sentence was not authorized under the applicable sentencing statute. The situation in Yeung is more analogous to the trial court's decision to amend Hooks's sentence immediately after it was imposed the first two times because the trial court had imposed an illegal sentence, and neither party in this case has claimed that those changes

31

during the initial sentencing hearing were in any way improper. This Court has held on numerous occasions that, "in correcting an illegal sentence, the double jeopardy protection is not violated even if the defendant has begun serving the original sentence." Cline v. State, 571 So. 2d 368, 370 (Ala. Crim. App. 1990) (citations omitted). Unlike in this case, in which the trial court imposed a valid sentence, in Yeung the trial court was authorized to amend the original illegal sentence, and that amended sentence was imposed "immediately" and without objection.

The trial court indicated at the second sentencing hearing that the amendment of Hooks's sentence was appropriate when it stated as follows: "Mr. Hooks was on a no bond or revoked bond such that he continues to accumulate jail credit toward his sentence. However, nothing has been transmitted to the clerk to indicate that the sentence has actually begun, though it might have been placed on the record." (R. 213-14.) Yet, this conclusion by the trial court is not dispositive of the issue.

Indeed, Tice, 475 So. 2d at 591, states that double-jeopardy protection in this context begins when the sentence is "entered," but this does not refer to the procedural step of filing the proper paperwork with

the clerk's office. This Court has uniformly held that "[i]ncreasing a valid sentence after a defendant has commenced <u>serving</u> the sentence violates the prohibition against double jeopardy in both the United States and Alabama Constitutions." <u>Snell</u>, 723 So. 2d at 108 (emphasis added). In this case, Hooks had clearly started serving his sentence. The trial court imposed the original sentence, and, as the proceedings concluded, the trial court stated:

> "So, Mr. Hooks, they'll take you back. You'll be serving your sentence -- you will go to DOC for that; okay? So they'll transfer you over to DOC at some point and you'll serve the remainder of your split -- whatever time you have remaining on the split will be served in DOC. When you're released from that, you'll start your term of probation. So they'll transfer you to DOC at some point.
>
> > "(The proceedings were adjourned on Tuesday, February 15, 2022 and resumed on Wednesday, February 16, 2022 as follows:)"

(R. 207-208.) When the parties returned the following afternoon, Hooks objected to an increased sentence and argued that

> "the sentence begins when it's read into the record. In terms of all of the rules of appellate procedure, that is when the sentence begins in terms of when the 42 days begins for us to give notice, it's when the 30 days begins for the Court to reconsider a sentence to give a more lenient sentence if it's a split sentence. It's not based on when the clerk's office gets the sentencing order. It's based on when it's read into the record."

(R. 214.) Here, the original sentencing hearing had already concluded and Hooks had been taken to jail. We agree with Hooks that he had already begun serving his sentence when he was resentenced by the circuit court. Because the sentence in question was a legal sentence that had commenced and because there was neither fraud nor a "compelling reason" to increase Hooks's sentence, the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution precluded the trial court from increasing Hooks's sentence.

> "To allow the second sentence to stand in this case would punish the appellant twice for the same offense. He would not only be put in jeopardy twice, but would actually be punished twice. Therefore, this case is due to be remanded to the trial court with instructions that the appellant's second sentence be vacated and that his original sentence be reinstated."

Snell, 723 So. 2d at 109.

### Conclusion

For the reasons stated herein, Hooks's conviction for second-degree assault is affirmed, but his sentence is reversed and this cause is remanded for the trial court to reinstate Hooks's sentence of 15 years and 1 day of imprisonment, split to serve 3 years of imprisonment followed by 2 years of probation. The trial court shall take all necessary action to

ensure that the circuit clerk makes due return to this Court within 28 days of the date of this opinion, and the return to remand shall include a transcript of the new sentencing hearing and the amended sentencing order.

AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED WITH INSTRUCTIONS.

Windom, P.J., and McCool and Minor, JJ., concur. Kellum, J., concurs in the result.